**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: 23-cv-00415-AP

COLORADO OFF ROAD ENTERPRISE,

MARCUS TRUSTY, in his capacity as president of CORE as well as his individual capacity,

PATRICK MCKAY, in his capacity as a Board Member of CORE as well as his individual capacity,

Petitioners,

v.

USDA FOREST SERVICE, an agency of the U.S. Department of Agriculture,

and

DIANA M. TRUJILLO, in her official capacity as the Forest and Grasslands Supervisor for the Pike and San Isabel National Forests, Cimarron and Comanche National Grasslands,

Respondents.

---

**PETITIONERS' OPENING MERITS BRIEF**

***Oral Argument Requested***

---

## Table of Contents

Table of Authorities ... iii

I. INTRODUCTION ... 1

II. STATEMENT OF FACTS ... 5

*Area 1- Wildcat Canyon* ... 5

The Forest Service roads in Wildcat Canyon have an extremely high recreational use benefit. ... 5

The Wildcat Canyon Roads were temporarily closed to motorized recreation after the Hayman Fire in 2002 so the PSICC could study the impacts of the fire. ... 12

The 2004 post-Hayman Fire Environmental Assessment under NEPA found motorized recreation was beneficial to the area. ... 12

The PSICC's Wild and Scenic River Study and South Platte Protection Plan allowed for continued use of the Wildcat Canyon roads for motorized recreation. ... 16

The South Park and South Platte Ranger Districts conducted a flawed TAP Process which was subsequently relied on for the final decision being challenged. ... 17

The PSICC deliberately prevented any consideration of motorized recreation on the roads at issue during the NEPA process. ... 24

The TAP Report findings were cut and pasted into the DEIS and FEIS and became the basis for the final minimum road system. ... 27

The agency's objection process made no corrections to the clear errors pointed out by Petitioners as to the Wildcat Canyon roads. ... 32

*Area 2- Loveland Mountain* ... 33

*Area 3- Winding Stairs Spurs* ... 35

*Area 4- Peerless Mountain* ... 37

*Area 5- Twin Cones* ... 39

II. ARGUMENT ... 42

1. Petitioners have standing. .......... 42

2. Standard of review. .......... 43

3. In establishing the minimum road system, the PSICC arbitrarily and capriciously relied on the patently false finding that the Wildcat Canyon roads at issue had a low recreational use benefit to motorized recreationists. .......... 45

4. The PSICC failed to conduct a valid NEPA analysis of the adverse environmental impacts of reopening the Wildcat Canyon roads at issue to motorized recreation, decommissioning the roads or shifting motorized recreation activity to nearby areas. .......... 52

   *A. NEPA standard* .......... 53

   *B. The PSICC failed to analyze adverse impacts of motorized recreation on the roads.* .......... 53

   *C. The PSICC failed to analyze adverse impacts of decommissioning roads in Wildcat Canyon.* .......... 56

   *D. The PSICC failed to analyze adverse impacts of increasing motorized recreation on other areas* .......... 57

5. The PSICC repeated many of the same legal violations it made with respect to the Wildcat Canyon roads when prohibiting public motorized recreation from roads in the Loveland Mountain area. .......... 58

6. The PSICC repeated many of the same legal violations it made with respect to the Wildcat Canyon roads when prohibiting public motorized recreation from roads in the Winding Stairs Spurs area. .......... 60

7. The PSICC repeated many of the same legal violations it made with respect to the Wildcat Canyon roads when prohibiting public motorized recreation from roads in the Peerless Mountain area. .......... 63

8. While the PSICC properly recognized the very high recreational use benefit from motorized recreation on all of NFSR 125 (Twin Cones Road), it came up with a contrived and invalid bases to nonetheless improperly prohibit that recreation on the full road. .......... 66

9. The PSICC failed to respond to CORE's comments submitted in response to the DEIS. .......... 68

III. CONCLUSION .......... 68

## Table of Authorities

<u>*Cases*</u>

*Alliance for the Wild Rockies v. U.S. Forest Service*,
907 F.3d 1105 (9th Cir. 2018) ........................................................................ 2, 3

*Biodiversity Conservation Alliance v. U.S. Forest Service*,
2012 WL 3264523 (D. Wy. 2012)........................................................................ 51

*Bowen v. American Hosp. Ass'n*, 476 U.S. 610 (1986)

*Center for Biological Diversity v. BLM,* 746 F. Supp. 2d 1055 (N.D. Cal. 2009)............ 55

*Center for Sierra Nevada Conservation v. US Forest Service*,
832 F. Supp.2d 1138 (E.D. Cal. 2011) ............................................ 44, 46, 51, 53, 56

*Committee to Preserve Boomer Lake Park v. DOT*,
4 F.3d 1543 (10th Cir. 1993) ........................................................................ 53

*Earth Island Institute [v. U.S. Forest Service*, 351 F.3d 1291 (9th Cir. 2003)................. 50

*Friends of the Bitterroot v. Marten*, 2020 WL 5804251 (D. Mont. 2020).................... 3, 54

*Friends of the Earth, Inc. v. Laidlaw Env'tl Serv., Inc.*, 528 U.S. 167 (2000) ................. 42

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
378 F.3d 1059 (9th Cir. 2004 ........................................................................ 55

*Idaho ex rel. Kempthorne v. U.S. Forest Service*,
142 F. Supp. 2d 1248 (D. Id. 2001)........................................................................ 57

*Idaho Conservation League*,
766 F. Supp. 2d 1056 (D. Id. 2011)........................................... 45, 46, 50, 55, 57, 58

*Initiative & Reform Inst. v. Walker*, 450 F.3d 1082 (10th Cir. 2006) .............................. 42

*Kern v. U.S. Bureau of Land Management*, 284 F.3d 1062 (9th Cir. 2002).................... 54

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989);

*Mission Group Kanas, Inc. v. Riley*, 146 F.3d 775 (10th Cir. 1998)................................ 45

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983) ........ 43

*Oregon Natural Desert Ass'n v. BLM*, 625 F.3d 1092 (9th Cir. 2010) ............................ 53

*Pryors Coalition v. Weldon*, 803 F. Supp. 2d 1184 (D. Mont. 2011) .............................. 47

*Sierra Club v. Kimbell*, 623 F.3d 549 (8th Cir. 2010) ..................................................... 53

*Silverton Snowmobile Club, v. U.S. Forest Service*,
433 F.3d 772 (10th Cir. 2006) ..................................................................... 51

*Utah Environmental Congress v. Bosworth*, 443 F.3d 732 (10th Cir. 2006) ............. 43, 44

*Vermont Yankee Nuclear Power Corp., v. NRDC, Inc.*, 435 U.S. 519 (1978) ............... 53

<u>*Statutes and Regulations*</u>

5 U.S.C. § 706(2)(A) ........................................................................................ 43

16 U.S.C. §§ 528-531 (Multiple-Use Sustained Yield Act of 1960) ........................... 1, 46

16 U.S.C. § 1601 *et seq*. (National Forest Management Act) .................................. 1, 51

42 U.S.C. § 4321 *et seq*. (National Environmental Policy Act) ....................................... 2

36 C.F.R. § 219.10 ............................................................................................ 51

36 C.F.R. § 212.5 ..................................................................... 1, 2, 18, 19, 47

36 C.F.R. § 212.50 ............................................................................................ 18

36 C.F.R. § 212.51 ............................................................................................ 18

36 C.F.R. § 212.55 ............................................................................ 1, 2, 47, 53

36 C.F.R. § 212.56 .............................................................................................. 1

40 C.F.R. § 1502.14 .......................................................................................... 57

40 C.F.R. § 1508.1 ............................................................................................ 57

## I. INTRODUCTION

Petitioners are challenging a final decision by the Forest Supervisor for the Pike-San Isabel National Forests & Cimarron and Comanche National Grasslands (PSICC) on behalf of the USDA Forest Service (collectively "Respondents") to prohibit motorized recreation on certain nationally-known Forest Service roads that have provided high quality recreational opportunities to the public for decades and many of which are located in an area of the PSICC where the law requires an emphasis on motorized recreation opportunities such as four-wheel driving. The decision to close these roads came as part of the PSICC's designation of the minimum road system (MRS) for the PSICC which identifies the roads within the PSICC that motorized vehicle recreationists can and cannot use.[1] Applicable statutes and regulations required that the PSICC, when designating the MRS, consider its effects on both the natural resources and recreational opportunities while adhering to the applicable and legally binding management guidelines set out in the Forest Plan.[2]

In reaching her final decision, the Forest Supervisor violated the laws applicable to each of the two steps required to develop a MRS. The first step involves the preparation of travel analysis process reports (TAP Reports) which set out a *suggested*

---

[1] The road designations made in the final decision will eventually be set out in a motor vehicle use map (MVUM). FS-00026699; 36 C.F.R. § 212.56.

[2] 16 U.S.C. §§ 528-531 (Multiple-Use Sustained Yield Act of 1960); 16 U.S.C. § 1601, *et seq*. (the National Forest Management Act which incorporates MUSYA's multiple-use management direction); 36 C.F.R. § 212.5(b)(1)(requiring MRS meet management objectives set out in the Forest Plan); 36 C.F.R. § 212.55(a)(Forest Service's Travel Management Rule setting out criteria for designating roads as part of an MRS).

MRS based on, among other considerations, the recreational opportunities provided by the roads.[3] The Respondents violated the laws applicable to this first step by basing their recommendations in the TAP Reports to prohibit motorized recreation on the roads at issue on PSICC staff members' patently false findings that the motorized recreational benefit of the highly popular roads at issue was actually not high.

Because these patently false findings were not corrected during the process required by the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*. (NEPA), despite clear evidence showing they were false, and were then relied on and adopted by the Forest Supervisor in making the final decision at issue as to the final MRS, the decision to prohibit motorized recreation on these roads had an invalid basis.[4] But for these invalid findings, the roads at issue would have been included as part of the recommended MRS (as either roads or trails) and four-wheel drive (4WD) recreation would have been authorized to continue on the roads because the travel management

[3] 36 C.F.R. § 212.5(b)(requiring preparation of an MRS based on consideration of the agency's management goals such as recreation); *id*. at § 212.55(a)(requiring the Forest Service in designating the MRS to consider the recreational opportunities provided by a road); FS-00001966 (an MRS "must provide needed access for recreation []"); FS-00003130 (determining the MRS involves a "balance" between the benefits of access and risks to the ecosystem); *Alliance for the Wild Rockies v. U.S. Forest Service*, 907 F.3d 1105, 1117 (9th Cir. 2018)(a "travel analysis report [] sets for a recommended MRS for a given area"); FS-00001957 (TAP Reports set out a "suggestion" for the MRS).

[4] FS-00025714 (the FEIS stated that "any specific road recommendation in the [TAP Reports] was adopted"); FS-00003155 (the roads assigned a high benefit in the TAP Reports "are needed as part of the minimum road system"); FS-00003259 (same); FS-00025717-25718 (the FEIS stated that any road that was given a high or moderate TAP rating for recreational use benefit would be retained as either a trail or road "open to all vehicles"); FS-00025687 (trails "can include vehicle class designations for appropriate use by such modes of transportation as high-clearance four-wheel-drive vehicles").

process criteria clearly supported allowing motorized recreation to continue on popular roads. Moreover, Respondents deliberately prohibited the public who engaged in motorized recreation from correcting these patently false findings in the suggested MRS as to the popularity of the roads at issue throughout the NEPA and final MRS analysis process by stating that any review of these findings, which had been originally set out in TAP Reports that could not be challenged by the public, was "beyond the scope of this undertaking." Respondents thereby "baked in" these invalid findings into the final EIS and final MRS thus ensuring highly popular motorized recreation on the roads at issue would now be prohibited in the MVUM to be issued. This violation by itself requires the Forest Supervisor's final decision as to the MRS and the roads at issue be vacated and set aside as arbitrary and contrary to law.

In addition to violating the MRS process by relying on a patently false findings that the public did not value motorized recreation on the roads, the Respondents also violated the second step of the process which requires a NEPA analysis of the potential environmental risks related to either allowing motorized recreation on the roads at issue or decommissioning those roads.[5] This NEPA analysis was required by

[5] The first step of the process at issue involves the development of a TAP Report and recommended MRS. The TAP Report is not a decision document and therefore its findings and recommended MRS cannot be appealed by the public until relied on for subsequent projects. The TAP Report is basically a document sitting on the agency's shelf setting out the agency's preliminary views. The recommended MRS set out in the TAP Report cannot be used by the agency as the basis for any actual actions on the ground until and unless it is analyzed by experts pursuant to NEPA, which is the second step of the process. *Friends of the Bitterroot v. Marten*, 2020 WL 5804251 at *2 (D. Mont. 2020)(the MRS involves two steps, the first of which is developing a "recommended" road system and the second of which is subjecting the bases for those recommendations to a NEPA review before any final MRS can be determined*), citing to Alliance for the Wild Rockies v. U.S. Forest Serv.,* 907 F.3d 1105, 1117 (9th Cir. 2018).

law before the *recommended* MRS could become a *final* MRS and be the basis for an MVUM. The NEPA process for determining the final MRS and the MVUM should have involved a vigorous review by experts of the preliminary findings by the PSICC staff (which did not include any experts) as to the potential environmental risks of continuing motorized recreation on the roads at issue which had been set out in the TAP Reports and was the basis for the recommended MRS. The NEPA process should also have vigorously assessed the environmental impacts caused by decommissioning the roads at issue.[6]

The NEPA process, however, did not properly evaluate the potential environmental risks set out in the recommended MRS regarding continued motorized recreation on the roads nor did it evaluate at all the impacts of decommissioning the roads at issue. The error led to both a misinformed and uninformed final decision to remove the roads at issue from the MRS and decommission them. The Respondents also insisted that the extremely superficial purported NEPA analysis of the impacts related to the roads at issue, which consisted of little more than a windshield review, overrode a very comprehensive prior NEPA analysis which had found that the roads should be kept open to motorized recreational use rather than being decommissioned and removed.

Accordingly, the Court should grant the Petition for Review and set aside the Forest Supervisor's final decision to prohibit public motorized recreation on the roads at issue.

[6] FS-00002146 ("Use appropriate environmental analysis to evaluate proposals to change existing travel management decisions" which decisions include a decision to decommission a route).

## II. STATEMENT OF FACTS

***Area 1- Wildcat Canyon***

**The Forest Service roads in Wildcat Canyon have an extremely high recreational use benefit.**

Wildcat Canyon, also known as The Gulches, is an area of Colorado known nationally for motorized recreation and, as the Respondents admit, has been especially popular with motorized recreationists for decades. FS-00030096-00030099 (the PSICC acknowledging that the roads at issue are "nationally-known four-wheel drive roads" which are "especially popular with four-wheel drive motorized users"); *see, e.g.*, FS-00045671-45672; FS-00045698-45707 (*Funtreks Guide to Colorado Backroads & 4-Wheel Drive Trails* (1998, 2010 and 2019 Eds.) describing the roads at issue); FS-00026238 (comment 10-1). The roads at issue in Wildcat Canyon include Forest Service Roads (NFSRs) 220 (Hackett), 220.A (Crossover), 220.B (Widow Maker), 221 (Longwater) and 540 (Corral Creek). *Id.*; FS-00045760; FS-00045813-45814; FS-00045915; FS-00024570; FS-00030221.

> The Gulches have long been enjoyed by off-road vehicle enthusiasts as one of Colorado's premier low elevation four-wheel-drive trail systems, with the roads in the area dating back to the mid-20th century and predating the 1984 Forest Plan. This area has been highly prized by motorized users for many decades due to its spectacular scenery dominated by deep canyons, sweeping views of the Tarryall Mountains and Lost Creek Wilderness to the west, towering rock formations, and easy access to a remote portion of the South Platte River.
> []
> Because of their close proximity to Denver and Colorado Springs, they are a frequent destination for trail runs by Front Range four-wheel-drive clubs.

FS-00045671.




FS-00027196 (Crossover (NFSR 220.A) is the section of the Hackett-Longwater Loop directly to the east of Widowmaker).



Part of the South Hackett Loop (FS-00045671).




FS-00045701 (from *Funtreks Guide to Colorado Backroads & 4-Wheel Drive Trails).*



This obstacle is known as Hackett Rock and is more difficult than this picture shows.



One of many difficult mogul runs. This one is located on F.S. 220A.



This optional obstacle is very dangerous and nearly impossible to climb without winching.

214

Hackett (FS-00045699) (from *Funtreks Guide to Colorado Backroads & 4-Wheel Drive Trails)*.



87

## The Gulches

AREA 7 map on page 196

Longwater Gulch drops dramatically into Wildcat Canyon through the Hayman Burn Area.

Hackett Gulch has several large rock obstacles.

*IMPORTANT NOTICE: After the Hayman Fire in 2002, Hackett Gulch, Longwater Gulch and Metberry Gulch were closed by the Forest Service. The closures were considered permanent unless another public entity volunteered to take them over. Almost immediately, Predator 4 Wheel Drive, which has worked hard for years to keep these trails open, began working with Teller County. In the end, Teller County accepted responsibility for the roads and that's why the trails are open today. Extreme environmental groups have been trying for years to permanently close this area to motorized recreation. Do your part by following the rules. Don't cross the river.*

FS-00045706 (from *Funtreks Guide to Colorado Backroads & 4-Wheel Drive Trails)*.



START MILEAGE LOG:

0.0 Zero trip odometer [Rev. Miles]
**HACKETT GULCH:**
Head west downhill. [3.9]
01 N39 04.701 W105 16.318
2.0 Hackett Rock. [1.9]
2.3 Stay right. Scenic overlook on left. [1.6]
3.7 Stay left. Closed road on right is original route to Longwater Gulch. [0.2]
3.9 Reach county line. Return to Wpt. 01 and head north 1.9 miles to Wpt. 02. [0.0]
0.0 Zero trip odometer
**LONGWATER GULCH:**
Head west uphill. [3.9]
02 N39 05.888 W105 16.503
2.9 Longwater Rock, no bypass. [1.0]
3.9 Reach county line. Return to Wpt. 02 and head north 0.4 mile to Wpt. 03. [0.0]
0.0 Zero trip odometer
**METBERRY GULCH:**
Stay left where main road goes right. [4.5]
03 N39 06.158 W105 16.627
2.7 Driver's choice. [1.8]
3.0 Driver's choice. [1.5]
3.5 Stay left downhill. [1.0]
3.8 Descend steep hill. [0.7]
4.5 Trail ends at camp spots along river. [0.0]
04 N39 07.441 W105 19.612

Longwater Rock is a popular spot to take pictures.

Metberry, like all the other trails, has lots of steep twists and turns.

FS-00045707 (from *Funtreks Guide to Colorado Backroads & 4-Wheel Drive Trails)*.

START *MILEAGE LOG:*

0.0 Zero trip odometer [Rev. Miles]
**HACKETT GULCH:**
Head west downhill. [3.9]
01 N 39° 04.70´ W 105° 16.32´
2.0 Hackett Rock. [1.9]
2.3 Stay right. Scenic overlook on left. [1.6]
3.7 Stay left. Closed road on right is original route to Longwater Gulch. [0.2]
3.9 End of trail. Return to Wpt. 01 and head north 1.9 miles to Wpt. 02. [0.0]
0.0 Zero trip odometer
**LONGWATER GULCH:**
Head west uphill. [3.9]
02 N 39° 05.89´ W 105° 16.50´
2.9 Difficult section.. [1.0]
3.6 Stay right. [0.3]
3.9 Reach gate. Return to Wpt. 02 and head north 0.4 miles to Wpt. 03. [0.0]
0.0 Zero trip odometer
**METBERRY GULCH:**
Stay left where main road goes right. [4.5]
03 N 39° 06.16´ W 105° 16.63´
2.7 Driver's choice. [1.8]
3.0 Driver's choice. [1.5]
3.5 Stay left. [1.0]
3.8 Descend steep hill. [0.7]
4.5 Trail ends at camp spots along river. [0.0]
04 N 39° 07.44´ W 105° 19.61´


Longwater Rock.


Rock near bottom of Metberry.

Trail updates & GPS downloads at www.funtreks.com







© 2010 FunTreks, Inc.

201

FS-00045705 (from *Funtreks Guide to Colorado Backroads & 4-Wheel Drive Trails)*.

The Respondents acknowledged in the 1984 PSICC Forest Plan that the roads were popular by applying the “Management Area 2A” prescription to Wildcat Canyon, which required the PSICC to *emphasize* semi-primitive motorized recreation opportunities when making management decisions in the area. FS-00000403 (“Management emphasis [for areas designated as 2A which includes Wildcat Canyon] is for semiprimitive motorized recreation opportunities such as [] four-wheel driving both on and off roads and trails”); FS-00000743 (map showing Wildcat Canyon designated as subject to Management Area 2A guidelines); *see* FS-00030097.

The challenges and scenery presented by the Wildcat Canyon roads area have made them extremely popular not just for motorized recreation alone, but by providing the ability to engage in other recreational activities once the area is accessed. FS-00030096-00030099; FS-00046399. Local 4WD clubs have been involved for years in the maintenance and upkeep of these roads. FS-00030096-00030099; *see* FS-00015352. Visitors to the PSICC, including persons with disabilities and others who are unable to enjoy remote areas of the forest without assistance, have used and want to continue to use these roads for motorized recreation/OHV riding, sightseeing and bicycling. *See, e.g.*, FS-00045752; FS-00045812; FS-00045825; FS-00045827; FS-00045862; FS-00045882; FS-00046477. In addition to being extremely popular with motorized recreationists, the Wildcat Canyon roads at issue also generate a major portion of the local economic base for the local area through tourism. FS-00045862; FS-00051408; FS-00051402; FS-00030225 (“Park and Teller Counties and the City of Woodland Park have lined up in favor of opening the roads” in Wildcat Canyon).

**The Wildcat Canyon Roads were temporarily closed to motorized recreation after the Hayman Fire in 2002 so the PSICC could study the impacts of the fire.**

In 2002, a Forest Service employee started the Hayman Fire in the Pike National Forest which burned approximately 138,000 acres of land, including land in Wildcat Canyon adjacent to the five roads at issue. *See* FS-00030066. Because the intensity of the Hayman Fire removed most of tree and plant life in the area and led to severe erosion, the PSICC *temporarily* closed the roads in Wildcat Canyon to motorized recreation while it assessed the impact the fire had on the area pursuant to NEPA. FS-00030066; FS-00030096; FS-00030163 (stating that roads would be reopened following any rehabilitation work). The PSICC did not close the roads because of any issues with the motorized recreation activity.

**The 2004 post-Hayman Fire Environmental Assessment under NEPA found motorized recreation was beneficial to the area.**

In 2004, the South Park, South Platte and other Ranger Districts in the PSICC completed an Environmental Assessment for the Hayman Fire Roads Management Project pursuant to a vigorous NEPA analysis of the future recreational activity on the Roads in Wildcat Canyon ("2004 EA") after the Hayman Fire. FS-00030062-30182. The 2004 EA consisted of a science-based roads analysis process that was specifically designed to help the PSICC better address the needs, issues and opportunities associated with the roads and managing recreation on those roads. FS-00030067.

In the 2004 EA, the PSICC again confirmed the popularity of the roads in Wildcat Canyon for motorized recreation, stating:

*Wildcat Canyon*

> One Hayman area of the South Platte District that is especially popular with four-wheel drive motorized users is the northern section of Wildcat Canyon which includes nationally-known four-wheel drive roads such as Metberry, Northrup, Longwater, and Corral Creek. Due to the Hayman fire and subsequent resource and safety concerns, these roads have been closed to public motorized access since June 2002. Nonmotorized access to this area was allowed in April 2003. The Wildcat Canyon area was extremely popular because of the 4x4 challenge of the roads, the South Platte River destination point, the opportunity for long and scenic loop rides, the close proximity to the Colorado Front Range and the many other dispersed recreational opportunities available in the area like fishing, hunting, camping, picnicking, and rock-climbing. Furthermore, many local OHV clubs were involved in the maintenance and upkeep of these roads through grant agreements with the Colorado State Parks OHV Fund and partnerships with the US Forest Service. Over the past 8-10 years, a considerable amount of volunteer hours and over $100,000 in grant monies has been dedicated to hardening and rehabilitating four-wheel drive roads in the area, especially Longwater, Corral Creek and Hackett.

FS-00030096. The PSICC reiterated this same popularity when referring to the Forest Roads 220 (Hackett), 540 (Corral Creek) and 220.A (Crossover). FS-00030099.

The PSICC repeatedly acknowledged the “tremendous popularity” of these roads for motorized recreation and admitted that the 2A Recreational Opportunity Spectrum (ROS) of Semi-Primitive Motorized set under the forest plan for these roads was:

> mostly appropriate since the area appears natural and the presence of other users is limited since only four-wheel drive vehicles can handle the roads. However the tremendous popularity of this area and prevalent management presence especially on weekends and holidays makes this area appear at times to be more in the ROS setting for Roaded-Natural (RN).

FS-00030097. In addition, the 2004 EA and the final decisions related to it noted that, due to the popularity of the roads at issue, prohibiting motorized recreation on the roads would increase the impacts of motorized recreation on other areas in the PSICC and possibly create overcrowding leading to “low visitor satisfaction.” FS-00030164; FS-00019666-19667; FS-00019686-19687; FS-00024572. The 2004 EA also analyzed the

impacts both of leaving the roads open to motorized recreation and closing and decommissioning the roads. FS-00030072 (the 2004 EA considered alternatives ranging from closing and possibly decommissioning anywhere from 0 to 77 miles of roads).

The Proposed Action in the 2004 EA was to re-open the roads at issue to motorized recreation. The 2004 EA concluded that lifting the suspension of motorized recreation on the roads along with appropriate maintenance of the roads "would reduce the environmental sediment load coming out of the project area." FS-00030115. The 2004 EA further concluded that "roads maintained to Forest Service standards have surfaces and drainage systems that reduce erosion and sediment runoff [and t]his would have a beneficial impact on downstream aquatic habitat." FS-00030121.

In addition, the 2004 EA recognized that "[m]any local OHV groups have offered their time and financial resources to accelerate the opening of roads in the burn area especially [roads in Wildcat Canyon such as] Hackett, Longwater, and Corral Creek." FS-00030162. Furthermore, the 2004 EA concluded that continuing to allow the tremendously popular area to be open to motorized recreationists would reduce crowding in other parts of the forest:

> Under [the alternative that would allow continued motorized recreation], there would be less displacement of visitors to motorized areas outside of the Hayman area since many popular Forest roads would be reopened. By keeping more classified Forest roads open to motorized use in the Hayman area, this could help reduce the potential for crowding and the visitor pressure and impacts being felt at areas on other parts of the Pike National Forest such as Badger Flats, China Wall, Rainbow Falls, and Breakneck Pass.

FS-00030164. The 2004 EA concluded that this decision "represents a good balance of recreation access and natural resource concerns in the burn area." FS-00030169.

Public demand for resumed access to these roads also continued. *See, e.g.*, FS-0005141-5142.

In 2004, the South Park and South Platte Ranger Districts issued special Decision Notices focused on Wildcat Canyon which were separate from the more general forest decision notices covering other parts of the burn area due to the high recreational use benefit of those particular roads. FS-00019662-19671; FS-00019682-19691. In those separate Decision Notices and Findings of No Significant Impact (FONSIs), the South Park and South Platte District Rangers concluded that allowing motorized recreation on the five Roads at issue "will have a long-term beneficial impact on the environment" including to "help reduce erosion and stream sediment loading" and resulting in "long-term beneficial impacts to water quality [], riparian areas [], downstream fisheries [] and aquatic habitat []." FS-00019667; FS-00019688. Both District Rangers in office at the time also concluded that carrying out Best Management Practices and the various mitigation efforts analyzed in the 2004 EA "will help minimize the amount of sediment entering streams." *Id*. The South Park and South Platte District Rangers further concluded that rehabilitating the roads at issue would only have "minor impacts or disturbances if sensitive wildlife species or habitats are involved." *Id*.

The South Park and South Platte District Rangers decided to implement the Proposed Action as set out in the 2004 EA as it pertained to the Wildcat Canyon Roads in those two Ranger Districts. FS-00019663; FS-00019683. The PSICC recognized that, like all forest roads, the roads in Wildcat Canyon would need to be maintained to allow public recreational use but the PSICC did not want to use any of its own funds to ensure this particular recreational use continued. Therefore, the Decision Notices

stated that the suspensions at issue should and would be lifted pursuant to an easement if and when a local road management agency agreed to ensure the roads would be maintained to prevent adverse environmental impacts. FS-00019663; FS-00019683. Portions of the roads at issue are in Teller County which requested and was promptly issued an easement allowing it to maintain the roads. FS-00045674. The remaining portions of the roads are located in Park County, which, because of the continuing public demand for motorized recreation on these roads, also sought an easement starting in 2008. FS-00045674-75; FS-00051403-51407; FS-00051417. Due to many years of stalling by the PSICC to avoid granting its requested easement, Park County finally gave up in 2015 and, while it still strongly supported all types of recreation on the roads, it ultimately deferred to the PSICC's judgment as to whether the recreational use benefit of the roads merited the cost of maintenance. FS-00051417; FS-00024242-24252. As demonstrated below, the PSICC never actually made this evaluation because the local PSICC staff falsely stated in the TAP Reports that the roads had no recreational use benefit.

**The PSICC's Wild and Scenic River Study and South Platte Protection Plan allowed for continued use of the Wildcat Canyon roads for motorized recreation.**

Between 1997 and 2004, the PSICC extensively analyzed the Wildcat Canyon area in another separate study called the South Platte Wild and Scenic River Study. FS-00019761-19782. Ultimately, the PSICC did not recommend to Congress that any section of the South Platte River be designated a Wild and Scenic River. FS-00019764. Instead, the PSICC decided to manage the river pursuant to the South Platte Protection Plan (SPPP). *Id.* The section on roads in the SPPP noted:

> Through previous discussions on travel management issues, participants in developing the SPPP reached general agreement that continued use of designated off-highway vehicle trails in Wildcat Canyon and the Corral Creek crossing would be allowed in the future [.]

FS-00020292.

Throughout the time the PSICC was preparing the South Platte Wild and Scenic River Study, continued motorized recreation on the 4WD roads in Wildcat Canyon adjacent to the river was viewed as fully compatible with wild and scenic river eligibility, and the segment of the river which included the Wildcat Canyon Roads was specifically designated as eligible for at most 'scenic' status rather than 'wild' status specifically for the purpose of allowing motorized use of these roads to continue. FS-00019779-19780 (maps showing Wildcat Canyon and its designation as Scenic). Both the Wild and Scenic River decision and the SPPP therefore determined that continued use of the Wildcat Canyon Roads for motorized recreation was fully compatible with protecting the South Platte River's eligibility for Scenic River status and the corresponding Outstanding Remarkable Values and planned for that use to continue.

**The South Park and South Platte Ranger Districts conducted a flawed TAP Process which was subsequently relied on for the final decision being challenged.**

In 2011, The Wilderness Society sued the PSICC for failing to comply with the laws which applied to authorizing use of forest roads. FS-00025680 (*The Wilderness Society et al. v. U.S. Forest Service*, 11-cv-246 (D. Colo.)). Each national forest is required to complete a travel analysis process (TAP) regarding the roads that exist on that forest as the initial step in ultimately determining the forest's minimum road system (MRS) and then must prepare a TAP Report (also referred to as a "TAR"). FS-00025682 (a "TAP is required by the TMR [Travel Management Rule at 36 C.F.R. 212,

251 and 261"]); *see* FS-00025654; FS-25713 (in 2012, "the Forest Service clarified the role of the TAP analysis in identifying the MRS, noting that 'the completion of the TAP is an important first step towards develop of the future [MRS]'"); 36 C.F.R. § 212.5(b)(1)(the Forest Service must identify a "minimum road system needed for safe and efficient travel" on each national forest); FS-00003131 (a TAP Report is prepared to document the TAP); FS-00003237 (same).[7] The TAP Report is exactly that, a report, and is not a decision. *See* FS-00001979; FS-00003130 ("Any actual route management decision made as a result of this TAP must be determined in a [NEPA] document"); FS-00003236 (same).

The basic approach used in a TAP is for the local forest staff to make a preliminary assessment of the benefits of a road as well as its potential risks and, based on that assessment, make *initial* recommendations as to whether a road should be retained or decommissioned. FS-00001958-1961 (the TAP Report should recommend roads to be included in the MRS); FS-00001967 (same); FS-00001978 (same); FS-00002142 (same). The local forest staff informally collects perceptions during the TAP process. FS-00003133 (staff use their experience in the area to make "initial judgments"; FS-00003239 (same). Those perceptions set out in the TAP Reports are then used to "inform" a subsequent and separate science-based NEPA analysis for the

[7] The Forest Service's Travel Management Rule requires it to both establish an MRS and to also designate roads on which motorized recreation can occur. 36 C.F.R. § 212.5 (requiring an MRS); 36 C.F.R. § 212.51 (requiring a designation of roads on which motorized recreation can occur). While these two efforts can be done separately, in this instance they were done as part of the same process. Notably, the Forest Service is not limited to the roads on the MRS when designating roads on which motorized recreation can occur. 36 C.F.R. § 212.50(b).

purpose of identifying the MRS needed for the designation of roads for motor vehicle use. FS-00003131 (the TAP Report is used "to inform" future proposed actions); FS-00003237 (same).[8] If roads have a high benefit, "the roads are needed as part of the minimum road system" and the recommendation is to keep the road as part of the minimum road system even if the road also is viewed as possibly having high risks. FS-00003155; FS-00003259; *see* FS00031166 (explaining why the PSICC kept certain roads with high benefits as part of the MRS).

TAP Reports themselves are not prepared subject to any NEPA process. FS-00001965; FS-00001978; FS-00003130; FS-00003236. TAP Reports are also not conducted or prepared by experts. FS-00003238-3139 (the TAP Reports at issue consist of analyses by "core team members [who] are not experts on each of the criteria" as well as other forest staff whose credentials are unstated); FS-00003132-3133 (same). Nor do the TAP Reports consist of any actual decisions by the agency as to the use permitted on the roads being reviewed. FS-00003130 ("Any actual route management decision made as a result of this TAP must be determined in a [NEPA] document"); FS-00003236 (same).

While the public may be able to comment on draft TAP Reports, because they are not decisions, the findings and recommendations in TAP Reports could not be

[8] 36 C.F.R. § 212.5(b)(1)(the Forest Service must identify a "minimum road system needed for safe and efficient travel" on each national forest); FS-00001965 (the TAP process is set out at Subpart A of 36 C.F.R. Part 212); FS-00003132 ("The primary objective of [the TAP Report] is to provide [] information"); FS-00003236 (same); FS-00003130 ("Any actual route management decision [such as the MRS] made as a result of this TAP must be determined in a [NEPA] document"); FS-00003236 (same); FS-0025714 ("The MRS process is subject to environmental analysis and decision-making, in accordance with NEPA"); FS-0001969-1979 (Forest Service Handbook 7709.55).

challenged or appealed. TAPs and TAP Reports are used solely for internal agency purposes to inform the actual decision maker. FS-00003133 ("this type of analysis is required to inform land management planning decisions when preparing a travel management plan"); FS-00003237 (same). Any actual decisions as to what types of recreation will be allowed on a specific road or whether the road will be closed must be determined after and pursuant to a rigorous science-based NEPA analysis by experts, which is separate and different than the TAP which is based on non-expert perceptions. FS-00003130; FS-00003236.

In 2015, the PSICC settled its lawsuit with The Wilderness Society and agreed to analyze all forest roads open to motorized use. FS-00025680. Also in 2015 and without any public announcement, the South Park and South Platte Ranger Districts quietly posted on an interior page of the PSICC website a link to their draft TAP Reports which the districts had prepared regarding the Wildcat Canyon roads at issue and as to which the public could comment (if they somehow discovered that the drafts had been posted online). FS-00003135; FS-00003164 (the South Platte Ranger District received one (1) comment to its draft TAP Report); FS-00003241-FS-00003278 (the South Park Ranger District received two (2) comments to its draft TAP Report).[9] Both TAP Reports focused on the five roads at issue in this matter as well as other Maintenance Level 1 and 2 roads.

[9] The PSICC was required to but did not provide "advance public notice" of these draft TAP Reports being available for comment consistent with the agency's procedures for notifying the public of proposed NEPA decisions pursuant to 36 C.F.R. § 212.52(a); FS-00002148.

Several months later, the South Platte Ranger District released a final TAP Report. FS-00003127-3176. The South Park Ranger District then issued its own final TAP Report in September of 2015. FS-00003233-3296. In preparing the TAP Report, the South Park Ranger District conducted an admittedly "rapid analysis" of all the roads on the district in a short four-day span. FS-00003239. The South Platte Ranger District's "rapid analysis" was even more brief, taking only one day. FS-00003133.[10] Each Ranger District's recommendations as to the roads at issue are set out in the charts in the TAP Reports. FS-00003161-3162; FS-00003268.

The TAP Reports stated that a "High (H) rating was assigned to roads [when] the road has a high value as a recreational experience." FS-00003146; FS-00003251. Notwithstanding the indisputably high recreational use benefit provided by roads 220 ("Hackett"), 220.A ("Crossover") and 220.B ("Widowmaker"), the South Park District Ranger staff inexplicably assigned a zero or (L) rating to these roads regarding the level the public valued them for the recreational experience they provided. FS-00003268; *see, e.g.,* FS-00045757; FS-00051410. And notwithstanding the indisputably high recreational use benefit of NFSR 221, the South Platte District Ranger staff inexplicably assigned a Medium or (M) rating to this road and a zero (L) rating to NFSR 540 ("Corral Creek") regarding the level the public valued them for recreation. FS-00003161-3162.[11]

---

[10] The PSICC stated in the Final Environmental Impact Statement (FEIS) that, when it settled the lawsuit with The Wilderness Society in 2015, "PSI staff moved quickly to implement their requirements and initiate the analysis of routes and areas potentially open to public motor vehicle use." FS-00025690.

[11] Petitioners stated in their comments on the DEIS:

If the South Park Ranger District had properly assigned NFSRs 220, 220.A and 220.B a high recreational use benefit, even under the TAP Report those roads would have been recommended to be part of the MRS. As shown on the TAR Reports rating page, each of these roads was inexplicably assigned a rating of "0" as to their recreational use benefit. FS-00003268. As a result, the roads each received a total benefit rating of "2." FS-00003268. Had these roads been properly given a high rating for their recreational use benefit and therefore assigned a rating of "2," each one would have a total benefit rating of "4." FS-00003268. Even under the TAP Report's evaluation system, a rating of "4" would result in the roads having a "high benefit." FS-00003256. Therefore, even if the roads also had a high risk rating, the TAP Report system mandated that "these roads are needed as part of the minimum road system" and that "action should be taken in order to reduce the risk impacts along these roads." FS-00003259. Regardless, if they had been properly given a high recreational use benefit, each of the roads would still have been designated as either roads or, at a minimum, trails open to motorized recreationists because that benefit by itself resulted in the road or trail being kept as part of the MRS pursuant to the FEIS's evaluation

---

> In the [unappealable] TAP reports for both the South Park and South Platte ranger districts, decision makers appear to have been convinced by commenters that because these roads were closed to the public, they should automatically be listed as having low recreational benefit, irrespective of whatever recreational benefit they had prior to being closed after the Hayman fire.

FS-00045680. The PSICC never responded to or denied this statement, nor did it ever provide a basis for these findings.

system. FS-00025717 (if a road had a "high benefit TAP rating" for recreational use, "management recommendation is *Convert to trail open to all vehicles*").

The TAP Reports made recommendations as to whether the road should be retained or decommissioned based solely on the Ranger District staff's assessment of the benefits of a particular road and the potential risk that the road *may* have adverse impacts. FS-00003132-3135 (the Ranger District staff's non-expert "core team completed an initial rapid analysis of all routes" based on their "experience" on the districts as well as other forest staff whose credentials are unstated); FS-00003238-3241. Because of the non-expert Ranger District staff's ratings as to each road, the TAP Reports recommended that, based on the roads being found Low Benefit and High Risk due to their scoring, the roads "are not needed as part of the minimum road system…." FS-00003258-3259; FS-00003154-3155.

As discussed below, those patently incorrect findings and resulting recommendations were directly carried over without correction into the FEIS which stated that it adopted the TAP Report findings *without question* and prohibited any analysis or comments on these perceptions. FS-000025715 (the PSICC "used the TAP recommendations to identify an MRS on the PSI"); FS-00025715 ("any specific road recommendation in the TARs was adopted"); FS-0045680-45684. This error was material because the FEIS stated that roads which were assigned a high (H) or moderate (M) rating for their recreational use benefit in the TAP Reports would be recommended left open to motorized use. FS-00025717-25718.[12]

[12]This error was also deliberate and not due to a mere disagreement between reasonable people. The gravitas of the Ranger District staff's deliberate effort to

**The PSICC deliberately prevented any consideration of motorized recreation on the roads at issue during the NEPA process.**

While the decision to close the roads at issue was pre-determined based on the PSICC's TAP Report findings made before the PSICC even began the Pike San Isabel National Forest Motorized Travel Management (MVUM) Analysis Project, the PSICC began the process for preparing a draft science-based Environmental Impact Statement (DEIS) pursuant to the terms of a settlement agreement it had entered into to resolve the lawsuit brought by The Wilderness Society. FS-00025680. After receiving public comments in response to its public scoping process, the PSICC began preparation of the DEIS in 2016. FS-00023776; FS-00023793.

Initially as discussed below, some of the staff on the PSICC made efforts to have the agency conduct a science-based evaluation of the impacts of re-opening the Wildcat Canyon roads at issue to motorized recreation as an alternative to be considered in the DEIS. FS-00030199. The record, however, demonstrates that the South Park and South Platte District Rangers made it clear that their plan was to *prevent* any NEPA analysis being conducted as to the actual impacts of motorized recreation on the Wildcat Canyon roads at issue because they did not want to risk the final decision by the Forest Supervisor authorizing that use. FS-00030199-30259.

---

predetermine the outcome of the process by putting their thumb on the scale was recognized by one member of the Ranger District staff who stated in an internal email:

> If our leadership wants to know why the motorized community does not want to cooperate with the forest service, this is a great example of why they don't trust us. I don't blame them for their outrage.

FS-00030199.

The PSICC Engineer/Transportation Planner recognized the high recreational use benefit of the roads to motorized recreationists and in an email sent on July 20, 2017, which stated:

> Public access into Wildcat Canyon is a very hot-button issue, and public comments on both sides of this issue were submitted during the MVUM EIS scoping period. As result of those public comments, we plan on analyzing the possibility of reopening the Park County segments of NFSRs 220.A and 220.B for public use as full size motorized trails, including the possibility of a river crossing.

FS-00030235 (recommending the two Ranger Districts "wait to see the result of the DEIS analysis" before insisting the Wildcat Canyon roads be closed). When the South Park District Ranger saw this email, his response demonstrated that he had already decided, before any NEPA review had been completed, that the roads in Wildcat Canyon would not be re-opened:

> Interesting, ***<u>how and why are we analyzing in the EIS wildcat reopening</u>***. As the ranger I never requested this. Who slipped this in? Since it was not the line officer ***<u>I expect this to be removed from the EIS alternatives</u>***.

FS-00030234 (emphasis added). The South Platte District Ranger stated the same:

> I concur with [the South Park District Ranger]. We specifically discussed this and agreed ***<u>we did not want this [alternative] in the EIS</u>***.

FS-00030233 (emphasis added). The South Park and South Platte District Rangers took deliberate actions during the process at issue for the purpose of ensuring that the roads in Wildcat Canyon would not be re-opened to motorized recreation as part of the MRS process. These actions included ensuring the ongoing NEPA process did not include any evaluations of the actual adverse impacts of motorized recreation on the Wildcat Canyon roads at issue that could be reviewed and evaluated by the Forest Supervisor but instead would merely incorporate without question the findings and

recommendations they had their staffs make in the TAP Reports which were to close and decommission the roads. *Id*.; FS-00030218 (the South Park District Ranger ordered that all alternatives in the EIS be changed to propose that the Wildcat roads be decommissioned).

When the PSICC Land Management Planner and NEPA expert read the District Ranger's email, he was surprised that the District Rangers were improperly predetermining the outcome of the NEPA process and said he thought "we agreed we would let the analysis speak for route disposition in this case." FS-00030233. The PSICC Fish and Wildlife Biologist who had been advocating for the closure of the roads to motorized recreation then responded to the Land Management Planner and made it clear than the Ranger Districts wanted to close the roads at issue to motorized recreation *before* the NEPA process was completed and not allow any possibility that the decision maker might decide to keep them open, stating:

> Wildcat Canyon is a contentious areas from both sides and is really difficult to address appropriately in an all-encompassing EIS. It has become an issue that needs to be dealt with sooner, rather than later [].

FS-00030232.

The South Park District Ranger subsequently and explicitly reaffirmed his goal of violating the law by preventing any NEPA analysis from being conducted as to the impacts of these roads which might lead the Forest Supervisor to decide to keep them open, stating in an email dated September 28, 2017:

> [] I think our best strategy is to ***<u>not do any NEPA</u>*** on the Corral Creek side [i.e., the side of the South Platte River where the roads are located in Park County]. We simply close the roads that have been opened illegally.
>
> [T]he option is to leave the final consideration of these roads for the MVUM EIS. That could [] re-open the roads to the public [].

FS-00051396 (emphasis added). The South Park District Ranger again reiterated his goal of preventing any NEPA analysis from being conducted or presented to the Forest Supervisor in an email dated October 12, 2017, in which he stated the options were to (1) leave the option of re-opening the Wildcat Canyon roads at issue in the EIS analysis for the Forest Supervisor to decide, (2) leave them in initially but then withdraw them during the process claiming they were outside the scope of the EIS, (3) "withdraw the re-opening option from the EIS immediately" or (4) replace the proposal to re-open the Wildcat Canyon roads with a proposal to decommission them. FS-30244-30245.

The South Park District Ranger's email reveals that his preferred option was to replace the proposal to re-open the Wildcat Canyon roads with the proposal to decommission them because it would ensure the roads would never be used by motorized recreationists. FS-00030240. But the South Park District Ranger also noted in his email the risk that leaving any possibility that motorized recreation might continue on the Wildcat Canyon roads pursuant to the NEPA process could result in the roads not being decommissioned, which was contrary to his agenda and the recommendation he and the South Platte District Ranger had made in the TAP Reports. FS-00030240.

**The TAP Report findings were cut and pasted into the DEIS and FEIS and were the basis for the final minimum road system.**

The PSICC then prepared and issued a Draft Environmental Impact Statement (DEIS) in September of 2019. FS-00023776. Petitioners submitted comments in response to the DEIS addressing the issues noted above. FS-00030040-00030061; FS-00045669-45707. The PSICC made no changes to the DEIS in response to Petitioners' comments.

The PSICC then subsequently issued the FEIS in September of 2020 (FS-00025652-26127) and the Forest Supervisor's Draft Record of Decision (ROD) in September of 2022. FS-00026566-26688. The Draft ROD contained the Forest Supervisor's determination as to what roads would be in the MRS and the roads on which public motorized recreation would be allowed. FS-00026585; FS-00026609-26683. In the FEIS in response to public comments on the DEIS, the PSICC first erroneously asserted that it was not able to even consider allowing motorized recreation on these roads because they were under the jurisdiction of Park County and not part of the Forest Service's road system. FS-00025740. The PSICC also simply relied on and restated the patently erroneous findings in the TAP Reports regarding the negligible recreational use benefit of the roads at issue to the public as well as the recommendation that the roads be decommissioned. The FEIS stated that these (flawed) ratings as to the recreational use benefit of the roads and the corresponding recommendations set out in the TAP Reports were incorporated directly into the FEIS without any further analysis or correction. As stated in the FEIS, the PSICC "used the TAP recommendations to identify an MRS on the [PSICC]" and "any specific recommendation in the [TAP Reports] was adopted." FS-00025712; FS-00025715.

The key table in the FEIS appeared at Appendix C, Table C-2. FS-00026090-26127. Table C-2 of the FEIS included a row for each road being assessed. As shown in the table below, the recreational use benefit ratings set out in the TAP Reports were simply cut and pasted into the FEIS. [13]

---

[13] The tables in some instances broke out both NFSR 220 , 220.A and 540 into two sections.

| | | Recreational Use Benefit Rate Assigned | | | |
|---|---|---|---|---|---|
| NFSR | Ranger District | TAP Report | | FEIS | |
| 220 | South Park | **L** | *(FS-00003268)* | **L** | *(FS-00026115)* |
| 220 | South Park | **L** | *(FS-00003268)* | **L** | *(FS-00026115)* |
| 220.A | South Park | **L** | *FS-00003268)* | **L** | *(FS-00026115)* |
| 220.A | South Park | **L** | *FS-00003268)* | **L** | *(FS-00026116)* |
| 220.B | South Park | **L** | *(FS-00003268)* | **L** | *(FS-00026116)* |
| 540 | South Park | **H** | *(FS-00003273)* | **L** [14] | *(FS-00026120)* |
| 221 | South Platte | **M** [15] | *(FS-00003161)* | **M** | *(FS-00026124)* |
| 540 | South Platte | **L** | *(FS-00003162)* | **L** | *(FS-00026125)* |

Despite multiple public comments stating that the PSICC had incorporated flawed findings from the TAP Reports, the PSICC essentially turned a blind eye to the fact that the findings were erroneous and stated that "[r]evision of the [TAP Reports] is beyond the scope of this undertaking." FS-00026157.

In addition, Table C-2 in the FEIS parroted the assessments of potential risk of adverse environmental harm as set out in the TAP Reports by the non-expert Ranger

[14] The Respondents never set out any basis for lowering the recreational use benefit for this section of NFSR 540 from high in the TAP Report to low in the FEIS. Therefore, the recreational use benefit finding in the FEIS for this section of NFSR 540 is clearly unsupported and therefor arbitrary.

[15] The TAP Report for NFRS 221 originally found that the recreational use benefit was high. FS-00003164. The finding, however, was reduced to Moderate based solely on the road being temporarily closed to motorized recreation. *Id.*; FS-00027216 (Petitioners pointed out this error).

District staffs without actually assessing in any way whether any such risk of adverse impacts actually existed and, if so, the level of that risk and what the adverse impacts were. FS-00026115; FS-00026116; FS-00026120; FS-00026124; FS-00026125. These assessments included the staff members' guesses as to the potential that the road may pose a risk to the environment based on the following unstated criteria, without any supporting documentation:

-TAP Watershed Risk Rating;

-TAP Wildlife Risk Rating; and

-TAP Botany Risk Rating.

*Id*. These assessments of potential risk were not part of any NEPA analysis and were completed by non-expert Ranger District staff merely as a proposed finding. FS-00003238-3139; FS-00003132-3133 (same).

The only place in the entire FEIS where the PSICC engaged in any apparent effort to conduct that actual assessment is also in Table C-2 in Appendix C of the FEIS. As noted above, Table C-2 includes a row for each road being assessed. In addition to setting out the erroneous TAP Report findings for the recreational use benefit and potential risk of each road, the table asks general screening questions which require Yes/No responses for each road to the following very general survey questions:

-Does the route or area intersect with impaired watersheds?

-Does the route or area intersect with riparian areas?

-Does the route or area intersect with FEMA high-risk flood hazard areas?

-Does the route or area intersect with soils having erosion potential of 0.43 are greater?

-Does the route or area intersect with invasive plant species?

-Does the route or area intersect with riparian or alpine vegetation communities?

-Does the route or area intersect with critical habitat for species federal listed as threatened or endangered?

-Does the route or area intersect with the wildlife habitat identified in the Colorado Parks and Wildlife Species Activity Mapping Data?

-Is the route or area located within 0.5 miles of a motorized trail?

-Is the route, area or parking location within 3 miles of a gateway community?

FS-00026115; FS-00026116; FS-00026120; FS-00026124; FS-00026125. As the FEIS states, these questions were merely general screening criteria, not substantive science-based analysis:

> For example, in considering damage to soil, watershed, vegetation, and other forest resources, the PSI analyzed *screening criteria* 1 (watersheds and water resources), and *screening criteria* 2 (soils, vegetation, and other forest resources) for each route. This was done by determining which routes intersect with impaired watersheds, wetlands, riparian areas, high-risk flood hazard areas, soils having erosion potential of 0.43 or greater, and riparian or alpine vegetation communities (a proxy for special status plant occurrences). **Appendix C** provides more details.

FS-00025719 (emphasis added). Furthermore, the cursory nature of these general screening questions in the FEIS stands in stark contrast to the detailed analysis set out in the 2004 EA. *Compare* FS-00030062-30182 (2004 EA).

As to the preparation of a MRS, the PSICC stated in the FEIS that the MRS had been completed and identified based on the non-science-based TAP Reports, which were completed prior to the completion of the FEIS or any NEPA analysis. FS-00025714 (the PSICC used the TAP process to "thereby identif[y] the MRS"); FS-0002561 (the MRS was "identified in the PSI's travel analysis process (TAP) reports").

The PSICC, however, also acknowledged in the FEIS that the recommended MRS and analysis set out therein as to adverse environmental impacts was required to also go through a NEPA analysis. FS-00025714 ("This MRS process is subject to environmental analysis and decision-making, in accordance with NEPA").

**The Forest Service's objection process made no corrections to the clear errors pointed out by Petitioners as to the Wildcat Canyon roads.**

In December 2020 and pursuant to the Forest Service's agency level review process, Petitioners submitted objections to the Acting Regional Forester in response to the FEIS and Draft ROD as to the PSICC's failure to properly take into account the benefit of motorized recreation on the five roads, failure to conduct a valid NEPA analysis as to the potential adverse impacts of allowing versus not allowing motorized recreation on the roads at issue and reliance on the flawed TAP Reports to reach the proposed final decision. FS-00030040-00030061; FS-00026912-27927. The PSICC made no changes to the FEIS or the Draft ROD in response to Petitioners' objections.

The Acting Regional Forester erroneously asserted in her March 8, 2021 response to Petitioners' objections that, under the TAP Reports, a road was assigned a high recreational use benefit *only* if it was either (1) a primary access route to developed recreational sites or (2) provided primary access routes to popular dispersed recreation areas. FS-00031409. She then asserted that the roads at issue were given a Low Recreation Use Benefit because they did not meet this definition. *Id.* In reality, the TAP Reports explicitly stated that a road was also assigned a high recreational use benefit if it had "high value as a recreational experience." FS-00003146; FS-00003251. As discussed above, the roads at issue indisputably had high value as a recreational

experience and therefore should have been assigned a high recreational use benefit under the TAP Reports. In addition, the Acting Regional Forester's response to Petitioners' objections confirms that the PSICC failed to conduct any valid NEPA analysis as to the roads at issue, but instead relied on the prior determinations in the TAP Reports as final and unalterable. FS-00031409.

The Forest Supervisor then issued her final ROD in September of 2022 upholding her prior determinations as to the roads at issue. FS-00026690-26736; FS-00026791-26890.

***Area 2- Loveland Mountain***

The PSICC also decided to prohibit public motorized recreation on NFSRs 192, 450 and 451 in the Loveland Mountain area. The record clearly demonstrates that NFSRs 192, 450 and 451 are very popular roads for motorized recreationists but were nonetheless erroneously found to have a low recreational use benefit in the TAP Report. FS-00003267 (setting out TAP Report finding of low popularity for motorized recreation on NFRS 192); FS-00003272 (same for NFSRs 450 and 451); FS-00026219 ("These roads are heavily used by the local community as both motorized and non-motorized year-round access to the Loveland ridgeline[,] are important connector roads[,] have been in use for over 100 years as a pass between the two drainages [and] are very important to our locals and are used for skiing, hiking, hunting, mountain biking, equestrian use, as well as motorized use"); FS-00026230 (same comments by other members of the public, John and Lisa Kunst); FS-00026147 ("With out this access to some these areas the elderly, handicapped, and very young would be excluded from enjoying these awesome places"); FS-00026161 (Colorado Parks and Wildlife (CPW)

commented "Keep open for hunter access [because t]hese roads give the public legal access through private property [and i]f this road is closed there will be a lot of public land that will no longer be accessible to the public"); FS-00045913 (NFSR 451 provides important access to structures showing Colorado's mining history, old cabins and ghost towns); FS-00045994 (these roads provide "motorized access to multiple historic mining ruins as well as an overlook with spectacular views of Mount Bross and the entire Leadville/Alma area"); FS-00045996 (NFSR 192 provides critical access between Mosquito Pass and trails around Kite Lake and Mount Bross); FS-00046003 ("This is a crucial trail system for motorized recreation around Alma, [] its loss would be keenly felt by the motorized community and [c]onverting these roads to special use permit roads would constitute the single largest concentrated mass closure in this travel management process, and that is simply unacceptable to the public").



FS-00045998 (View of Mount Bross from NFSR 451).




FS-00045999 (NFSR 451). Based on these erroneous findings, the Forest Supervisor's final decision was to close these roads to the public. FS-00026873 (NFSR 192); FS-00026874 (NFSRs 450 and 451).

***Area 3- Winding Stairs Spurs***

The PSICC also decided to prohibit public motorized recreation on NFSRs 323 and 324.B in the Winding Stairs area. NFSR 323 is popular with motorized recreationists and also provides key access to recreational areas. FS-00026179 (comment 183-B)(NFSR 323 "leads to a highly scenic overlook at the top of a large bounder field looking down toward Palmer Reservoir and south toward Pikes Peak [and] also has several scenic and desirable campsites"); FS-00026210 (comment 2917-22, 2918-24)(same); FS-00026220 (comment 307-2)("This is a great trail, that leads up to picturesque overlooks of the Pike National Forest [and t]here are numerous camping opportunities up in this region"); FS-00026251 (comment 1765-1)(NFSR 323 is part of a "fun set of off-road trails that can be used conjunction with each other to make for a fun day or weekend worth of Jeeping or ATV'ing [and is] open and fun for winter exploring and off-roading [and has] used for decades and we should be able to continue to enjoy them the way we have been with motorized vehicles"); FS-00026373 (comment 2781-

8)(NFSR 323 " is a high value route for deer and elk hunting"). Nonetheless, NFSR 323 received a moderate recreational use benefit rating along with a low risk rating. FS-00003738.



Campsite accessed via NFSR 324.B (FS-00027078).



Views from NFSR 323 (FS-00027074).

NFSR 324.B is also very popular with motorized recreationists and provides key access. FS-00026179 (comment 183-9)(NFSR 324.B "offer[s] important dispersed camping opportunities in an area that is already extremely crowded with campers in the summer and lacks a sufficient number of campsites" and if closed "the public would be deprived of two significant roads over 2 miles in length with good dispersed camping opportunities"); FS-00026210 (comment 2917-22)("the high scenic value of the overlooks at the ends of both of these trails plus the unique dispersed camping opportunities they offer, demands that they be included in the minimum road system"); FS-00027078 (NFSR 324.B "provides access to the []Sidney Harrison plane crash site [which ] where a WWII-era fighter pilot crashed a military trainer aircraft during the 1950s"). NFSR 324.B nonetheless received a low recreational benefit use rating. FS-00003738.

***Area 4- Peerless Mountain***

NFSR 603 in the Peerless Mountain area is an extremely popular route used by 4WD recreationists to access historic mine ruins at the Peerless Mountain site, provide hiking access to nearby lakes and the summits of two mountains as well as view high alpine scenery around Peerless Mountain. *See, e.g.,* FS-00027045-27046; FS-00026148 ("Keep NFSR 603 'as is' and open to public access"); FS-00026148 ("Keep open for public access and hunting because this [] road allows the public to access public land on the other side" and is used by "a lot" of hunters); FS-00026175; FS-00026180 (the road "provide[s] access to some great fishing [] and some very interesting only mining areas that are great to explore" and are "necessary for my continued enjoyment for recreational purposes"); FS-000226182 (same); FS-000226183

(same). Notwithstanding that these facts, the TAP Report inexplicably made a finding that NFSR 603 only had "moderate" recreational use benefit and the PSICC closed it to public use. FS-00003273; FS-00028875.



Summit of NFSR 603 (Peerless Mountain Road) at Horseshoe Pass (FS-00027043).



Historic mineshaft accessed by NFSR 603 (Peerless Mountain Road)(FS-00027045).

***Area 5- Twin Cones***

NFSR 126 (Twin Cones) "has long been one of the most popular four-wheel-drive trails close to Denver along Highway 285." FS-00045772-45775 (noting the spectacular fall colors from the Aspen groves as well as access to dispersed camping opportunities); FS-00026155 (comment 2140-1)("Twin Cone is an important trail to the 4x4 community and has been a long-time favorite for a day trip as it is close to Denver and Central Colorado"); FS-00026156 (comments 2641-11, 3005-7)(same); FS-000026157 (comment 53-1)(same); FS-00026171 (comment 3092-6).



FS-00045772 (Twin Cones Road).

For 30 years prior to the start of the road analysis process at issue, the PSICC recognized the high recreational benefit of motorized recreation on NFSR 126 by designating the entire road open to public motorized recreation. FS-00027056-27059. This recreational activity occurred notwithstanding that, due to a mapping error, the upper portion of NFSR 126 was incorrectly designated as being within a 3A

Management Area which guidelines were to prohibit motorized recreation. *Id*. In 2016, the PSICC agreed, pursuant to its settlement of The Wilderness Society lawsuit, to temporarily close the road to motorized recreation without having completed any NEPA analysis. Notwithstanding the high recreational benefit of motorized recreation on NFSR 126 and the guidelines in the MRS process which called for the road to be left open to motorized recreation, during the subsequent NEPA analysis every alternative including the no action alternative left the road closed.

Notably, the PSICC agreed that the upper section of NFSR 126 has a high recreational use benefit. FS-0003161. The TAP Report, however, did not recommend opening that upper portion of the road to motorized recreation, even though it had high recreational benefit *solely* because it was located in an area designated by the current Forest Plan for 3A management. FS-00003161 ("Recommend eliminating public access w/i 3A ; from MP 5.13 to 7.37; keep as admin road"). This section of NFSR 126, however, was included in this management area due to a mapping error. FS-00045775-45777.

In the DEIS, the PSICC proposed to change the Forest Plan to correct the prior mapping error and remove this portion of NFSR 126 from this management area. FS-00045774 ("This error is proposed to be corrected with a Forest Plan amendment in this travel planning process"); FS-00024085 (setting out Forest Plan amendment because "[t]here is a need to change the Forest Plan to rectify the Management Area 3A boundaries and provide recreational access on the South Platte [] Ranger District[] under alternatives C [the selected alternative]. NFSR[] 126 [is an] existing route[] that currently provide[s] motorized recreational access; a plan amendment would ensure

future motorized recreational use is consistent with the Forest Plan"); FS-000031167 (PSICC recognized need to correct mapping error).

Petitioners pointed out these errors in great detail in their comments and objections. FS-00045776-45778; FS-00026294; FS-00027055-27065. In its response to Petitioners' comments on the DEIS, the PSICC stated that it was relying on the TAP Report recommendation to close this portion of NFSR 126 even though, as shown above, that recommendation was based on the area being kept in a 3A management area. FS-00026155-26156; FS-00026185; FS-00026232.

In its response to Petitioners' objections, the Acting Regional Forester claimed that the recommendation was valid because the TAP Report found a possible high risk of adverse environmental impacts. This assertion, however, is directly contradicted by the actual FEIS which determined that, contrary to the TAP Report proposed findings, motorized recreation on NFSR 126 would have "minor" environmental impacts. FS-00025989-FS-00025990. The Acting Regional Forester also alleged the recommendation was based on concerns of potential vandalism. FS-00031239. The TAP Report, however, says nothing about vandalism along NFSR 126. FS-00003127-3176.

When the Final ROD was issued, however, the Forest Supervisor reversed herself and suddenly claimed that she had decided that allowing motorized recreation on the upper section of NFRS 126 was not "necessary to allow reasonable public access" on that road. FS-00026715. The Forest Supervisor had, however, previously determined in her Draft ROD that motorized recreation on this part of NFSR 126 would "provide reasonable recreation opportunities, while providing for multiple use

management, such as resource protection." FS-00026591. The Forest Supervisor, however, never identified why she had suddenly decided that motorized recreation on this part of NFSR 126 was not necessary given that she had previously decided it was needed to provide these recreational opportunities.

Petitioners, who have been and continue to be harmed by the Forest Supervisor's unlawful decision to decommission the Wildcat Canyon NFSRs at issue, timely filed this Petition for Review.

## II. ARGUMENT

### 1. Petitioners have standing.

This Court has Article III jurisdiction to review Petitioners' claims. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Env'tl Serv., Inc.*, 528 U.S. 167, 180-81 (2000) (summarizing the requirements for standing). As extensively set out in Petitioner's Complaint as well as the administrative record in this matter, Petitioners and their members have longstanding, cognizable interests in the recreational opportunities that will be impaired or permanently eliminated by the agency decisions challenged in this case.

Given the serious and fatal flaws that tainted the decision by Forest Supervisor—violations the Court must assume Petitioners will establish on the merits, for purposes of standing, *see, e.g.*, *Initiative & Reform Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006)—Petitioners have amply demonstrated standing to challenge the Forest Supervisor's decision and as well as the underlying analyses and actions that threaten their cognizable interests.

**2. Standard of review.**

This matter involves the Court's review of findings and a final decision by the Forest Supervisor of the PSICC on behalf of the USDA Forest Service. Because the statutes at issue do not involve a private right of action, the Forest Supervisor's finding and decision is reviewed under the standard set forth in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)("APA"). *See Utah Environmental Congress v. Bosworth*, 443 F.3d 732, 740 (10th Cir. 2006). The APA requires the court to hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). "With respect to the 'arbitrary and capricious' component of the administrative review standard, a reviewing court must set aside an agency's decision or action if "the agency has [] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

Deference to an agency's decision "has not come so far that we will uphold regulations whenever it is possible to 'conceive a basis' for administrative action." *Bowen v. American Hosp. Ass'n*, 476 U.S. 610, 626 (1986)(plurality opinion). Instead, "[t]he agency 'must articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,' and this Court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43. As the Tenth Circuit has explained:

> While administrative agencies generally are afforded a presumption of regularity, an agency's decision will nonetheless be arbitrary and capricious "if the agency . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983). Furthermore, we must determine whether the disputed decision was based on consideration of the relevant factors and whether there has been a clear error of judgment. *Id.*

*Utah Environmental Congress*, 443 F.3d at 740.

Moreover, “[w]hile [judicial] review under the arbitrary and capricious standard is necessarily narrow, it is not insubstantial” and courts “are required to "engage in . . . a probing, in-depth review.” *Qwest Commc’ns Int’l Inc. v. FCC*, 398 F.3d 1222, 1229 (10th Cir. 2005) (quotation marks and citations omitted). While pursuant to their probing review courts should not flyspeck agency decisions, particularly if they are based involve tens of thousands of pages, and minor gaffes are not a basis to overturn an agency decision, such decisions must be set aside if the deficiencies are significant enough to defeat the goals of informed decision making and informed public comment. *See Center for Sierra Nevada Conservation v. US Forest Service*, 832 F. Supp.2d 1138, 1149 (E.D. Cal. 2011).

As shown below, Respondents’ errors as to the roads at issue in this case were both material and deliberate and will result in significant adverse impacts to Petitioners as well as the motorized recreation community. Furthermore, because the factual finding as to the popularity of motorized recreation on the roads also does not involve an interpretation of a regulation or expertise in matters related to natural resources, an assessment of the validity of the PSICC’s findings does not call for much if any

deference to the agency. *See, generally, Mission Group Kanas, Inc. v. Riley*, 146 F.3d 775, 780 n. 3 (10th Cir. 1998).[16]

**3. In establishing the minimum road system, the PSICC arbitrarily and capriciously relied on the patently false finding that the Wildcat Canyon roads at issue had a low recreational use benefit to motorized recreationists.**

Under the applicable law as well as the PSICC's specific process for establishing an MRS, a road's recreational use benefit rating is critical to whether the road will be included in the final MRS. In this matter, the PSICC made an erroneous finding that the roads at issue in Wildcat Canyon had a low recreational use benefit and this finding was relied on by the Forest Supervisor in making her final decision. This erroneous finding is directly contradicted by the record which demonstrates that the roads were highly popular and the only reason the public was not using them was because the PSICC had temporarily prohibited motorized recreation while it assessed the impact of the Hayman Fire on the area. Therefore, the PSICC's erroneous finding and the final decision upon which it was based is arbitrary and capricious. As demonstrated below, this erroneous finding had a material impact on whether roads would be part of the final MRS. Because the PSICC's arbitrary and capricious finding was material to if not dispositive of the final decision not to include the roads at issue in the final MRS, the decision in the final MRS as to these roads must be set aside.

---

[16] In addition, "where the agency has fallen short of its regulatory obligations or the record is insufficient to demonstrate a rational connection between facts and decision making, there is no place for judicial deference." *Idaho Conservation League*, 766 F. Supp. 2d 1056, 1079 (D. Id. 2011).

*Laws applicable to the MRS*

The Forest Service is required by statute to balance many different uses of the lands, including recreation, when making land management decisions such as the one at issue. As set out in *Idaho Conservation League v. Guzman*, which involved a review of the Forest Service's creation of a travel management plan on the Salmon-Challis National Forest in Idaho:

> The Forest Service manages the lands it administers under a multiple-use management framework set forth in the Multiple-Use Sustained Yield Act ("MUSYA") of 1960, *16 U.S.C.A. §§ 528-531*. MUSYA requires a careful balancing of often competing resources, including "outdoor recreation, range, timber watershed, and wildlife and fish purposes." *16 U.S.C. § 528*.

766 F. Supp. 2d 1056, 1060 (D. Id. 2011). As the court in *Idaho Conservation League* further stated:

> In addition, forest-specific management decisions are guided by the National Forest Management Act ("NFMA"), *16 U.S.C. § 1601, et seq.* NFMA incorporates MUSYA's multiple-use management direction[.]

*Id*. at 1060; *see Center for Sierra Nev. Conservation*, 832 F. Supp. 2d at 1142 (finding the Forest Service violated NFMA and the applicable Forest Plan in establishing travel management plan on the Eldorado National Forest).

The agency's regulatory requirements as to managing travel and motorized recreation on national forest system lands pursuant to these statutes are set out at 36 C.F.R. Part 212 (Travel Management) and known as the Travel Management Rule. *See Idaho Conservation League*, 766 F. Supp. 2d at 1060. The Forest Service recognized that the travel management rule was implemented to manage motor vehicle use, "but that motor vehicle use on Federal lands continue in appropriate locations." 70

Fed. Reg. 68264, 68281 (November 9, 2005). The specific requirement for the agency to establish an MRS is set out at 36 C.F.R. § 212.5(b):

> (1) Identification of road system. For each national forest, [] the responsible official must identify the minimum road system [MRS] needed for safe and efficient travel and for administration, utilization, and protection of National Forest System lands. In determining the minimum road system, the responsible official must incorporate a science-based roads analysis at the appropriate scale []. The minimum system is the road system determined to be needed to meet resource and other management objectives adopted in the relevant land and resource management plan (36 CFR part 219), to meet applicable statutory and regulatory requirements, to reflect long-term funding expectations, to ensure that the identified system minimizes adverse environmental impacts associated with road construction, reconstruction, decommissioning, and maintenance.

The criteria to be used by the agency for determining which roads and trails to include in the MRS is set out at 36 C.F.R. § 212.55(a):

> (a) General criteria for designation of National Forest System roads, National Forest System trails, and areas on National Forest System lands. In designating National Forest System roads, National Forest System trails, and areas on National Forest System lands for motor vehicle use, the responsible official shall consider effects on National Forest System natural and cultural resources, public safety, ***<u>provision of recreational opportunities</u>***, access needs, conflicts among uses of National Forest System lands, the need for maintenance and administration of roads, trails, and areas that would arise if the uses under consideration are designated; and the availability of resources for that maintenance and administration.

(Emphasis added.)[17]

[17] These criteria are clearly to be used when determining which roads to include in an MRS, and not only after such roads have been selected for the MRS. In addition, the regulations also set out specific additional criteria at 36 C.F.R. § 212.55(b) which apply solely to the designation of trails as opposed to roads. The criteria set out in 36 C.F.R. § 212.55(b) as to trails do "not mandate minimization of environmental damages," but instead "lend guidance" towards maintaining "the regulation's objectives." *Pryors Coalition v. Weldon*, 803 F. Supp. 2d 1184, 1195 (D. Mont. 2011).

*Popularity of the Wildcat Canyon roads*

As demonstrated above and by the PSICC's own prior findings, the roads in Wildcat Canyon at issue have long been highly popular and sought-after for motorized recreation. As the PSICC itself acknowledged, the "especially popular" roads are "nationally-known" and are "extremely popular because of their challenging terrain, destination points, opportunity for long rides and their closeness to the Colorado Front Range as well as many other dispersed recreational opportunities available in the area like fishing, hunting, camping, picnicking, and rock-climbing. FS-00030096; FS-00030099; FR-00045698-45707 (*Funtreks Guide to Colorado Backroads & 4-Wheel Drive Trails* describing the roads at issue). In fact, the 1984 Forest Plan specifically required the PSICC to emphasize motorized recreation in the Wildcat Canyon area due to this popularity. FS-00030097; *see* FS-00030164 (eliminating motorized recreation from this area would displace many recreationists). And these recreationists did not simply enjoy the area, they put in substantial time and effort as volunteers as well as obtaining monetary grants to maintain the roads to minimize any impact on the environment. FS-00030096.

While the PSICC temporarily closed these roads to motorized recreation in 2002 solely for purposes of conducting an assessment of the impacts of the Hayman Fire in the area of the roads, the roads' popularity never changed as demonstrated by the public comments received by the PSICC in this instant proceeding. *See, e.g.*, FS-0005141-5142. Visitors to the PSICC, including disabled persons and others who are unable to enjoy remote areas of the forest without assistance, have used and desire to continue to use these roads for motorized recreation/OHV riding, sightseeing and

bicycling. *See, e.g.*, FS-00045752; FS-00045812; FS-00045825; FS-00045827; FS-00045862; FS-00045882; FS-00046477; FS-00051417; FS-00024242-24252; FS-00024569-24577; FS-00030040-30061; FS-00045669-45707.

*Erroneous TAP Report findings*

Notwithstanding this clear popularity (and likely because of it), the South Park and South Platte Ranger Districts falsely asserted in their 2015 TAP Reports that these roads actually had low or medium recreational use benefit. As to FSR 221, the South Platte TAP Report gave it a score of one (1) and thus an "M" for medium as to its recreational use benefit. FS-00003162.

As to FSRs 220, 220.A and 220.B, the South Park TAP Report gave them all a score of zero and thus an "L" for low as to their recreational use benefit, as well as overall score of "Low" for road benefit. FS-00003268. These findings were never previously subject to challenge (until relied on in the instant matter) because they were set out in a TAP Report, which is an internal agency recommendation and not a final decision and therefore not appealable. Had these findings in the TAP Reports been correct and the roads recognized as having a high recreational use benefit, the roads would have been recommended in the TAP Reports for inclusion in the MRS. *See supra* pp. 22-23; FS-00003155; FS-00003259.

*The incorporation of the TAP Report findings into the FEIS without any changes as the basis for the final decision*

As discussed above, the PSICC then essentially cut and pasted the incorrect findings from the TAP Reports into the FEIS without question, review or analysis. *See supra* pp. 23, 27-32; FS-000025715 (the PSICC "used the TAP recommendations to identify an MRS on the PSI"); FS-00025715 ("any specific road recommendation in the

TARs was adopted"); FS-0045680-45684; FS-00026124) (findings for NFSR 504); FS-00026115-26116 (findings for NFSRs 220, 220.A and 220.B). As discussed above, Petitioners specifically pointed out during the process that the PSICC had made an obvious error in finding that these roads had low recreational use benefit and apparently had based its finding on the fact that the public was not currently engaging in motorized recreation on the roads due to the roads being (temporarily) closed to motorized recreation. FS-00045680; FS-00003164; FS-00027216. The PSICC ignored this comment and the fact that the findings were erroneous and instead deliberately shielded them from the public's efforts to correct them in the EIS process by repeatedly asserting that "[r]evision of the [TAP Reports] is beyond the scope of this undertaking." FS-00026157 (response to comment 176-12); FS-00026164 (response to comment 176-4); FS-00026165 (response to comments 176-14, 176-15); FS-00026167 (response to comments 176-2, 176-24); FS-00026177 (response to comment 176-9); FS-00026182-26183 (response to comments 2027-3, 2110-1); FS-00026196 (response to comments 2641-8, 2641-9); FS-00026238 (response to comment 10-1); FS-0045680-45684.

As the court held in *Idaho Conservation League*, 766 F. Supp. 2d at 1077:

> The Court cannot defer to the agency in situations where, as here, the agency does not address conflicting evidence in the Administrative Record. "Courts must independently review the record in order to satisfy themselves that the agency has made a reasoned decision based on its evaluation of the evidence." *Earth Island Institute [v. U.S. Forest Service*, 351 F.3d [1291,] 1301 [9th Cir. 2003)]. If an agency fails to make a reasoned decision based on an evaluation of the evidence, the Court must conclude that the agency has acted arbitrarily and capriciously. *Id.*

As also demonstrated above, had the roads at issue been properly evaluated in the TAP Reports and had the Forest Supervisor been aware of the high popularity of these

roads at the time she made her final decision based on the FEIS, they would have been recommended as part of the MRS and she likely would have decided to keep these roads open to motorized recreation. *See supra* pp. 22-23; FS-00025717-25718 (if a road had a high or moderate benefit TAP rating for recreational use, "management recommendation is *Convert to trail open to all vehicles*").

In addition, the PSICC's false findings precluded it from complying with the 1984 Forest Plan requirement that it emphasize motorized recreation in Wildcat Canyon. "NFMA establishes a two-step process for forest planning. First, the Forest Service prepares a forest plan." *Biodiversity Conservation Alliance v. U.S. Forest Service*, 2012 WL 3264523 at *8 (D. Wy. 2012)(quoting *Silverton Snowmobile Club, v. U.S. Forest Service*, 433 F.3d 772, 785 (10th Cir. 2006). "Second, the Forest Service is required to implement the forest plan by approving or disapproving specific projects" which "must be consistent with the governing forest plan." *Id*. at *9; 433 F.3d at 785; *see Center for Sierra Nevada Conservation*, 832 F. Supp.2d at 1142 ("The Forest Service must ensure that all projects are consistent with the [LRMP]"); 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10 ("All site-specific decisions, including authorized uses of land, must be consistent with the applicable plan"); FS-00026727 (other than making changes related to areas not at issue, the Forest Supervisor stated that "there will be no changes to standards, guidelines, or other management direction [] in the forest plan"). The PSICC's erroneous finding that the roads had a low recreational use benefit and decision to close them effectively de-emphasized motorized recreation in Wildcat Canyon, as intended by the District Rangers. *See* FS-00027253-27254 (in an internal memorandum to their staffs drafted in 2018, the current South Park and South Platte

District Rangers laid out their campaign to de-emphasize 4WD recreation in Wildcat Canyon).

The Forest Supervisor's blind reliance on the erroneous finding that the highly popular roads at issue did not have a high recreational use benefit was clearly arbitrary and capricious. This finding was also a material if not a definitive factor in the Forest Supervisor's decision to remove the roads from the MRS thus prohibiting any future motorized recreation on the roads. This error resulted in the PSICC violating both the 1984 Forest Plan guidance which it is required by NFMA to adhere to as well as the regulations which apply to establishing an MRS. In fact, the PSICC has agreed it probably violated the Forest Plan because it previously stated in the 2004 EA that if it prohibited motorized recreation on these roads "a Forest Plan Amendment would probably be necessary." FS-00030167. Therefore, the Forest Supervisor's decision as set out in the Final ROD to prohibit motorized recreation on the roads at issue should be set aside.

**4. The PSICC failed to conduct a valid NEPA analysis of the adverse environmental impacts of reopening the Wildcat Canyon roads at issue to motorized recreation, decommissioning the roads or shifting motorized recreation activity to nearby areas.**

The Forest Supervisor's final decision to permanently close NFSRs 220, 220.A, 220.B, 221 and 540 in Wildcat Canyon to motorized recreation is also legally invalid because the PSICC did not complete a valid analysis of the adverse environmental impacts of motorized use on the roads at issue. In addition, the PSICC failed to analyze the adverse environmental impacts of permanently closing these roads to motorized recreation and furthermore of decommissioning the roads. These analyses were required by NEPA and the MRS process. These failures denied the public the

information it needed to properly comment on the alternatives provided in the DEIS, as well as denying the Forest Supervisor information needed to assess the alternatives and conduct the balancing of the benefits and risks of motorized recreation on the roads as required under the MRS process.

### *A. NEPA standard*

The purpose of NEPA is "to 'insure a fully informed and well-considered decision, not necessarily a decision the judge of [this court] would have reached had they been members of the decisionmaking unit of the agency.'" *Sierra Club v. Kimbell*, 623 F.3d 549, 559 (8th Cir. 2010), quoting *Vermont Yankee Nuclear Power Corp., v. NRDC, Inc.*, 435 U.S. 519 (1978). NEPA "only requires that the environmental impacts be considered in the decision process." *Comm. to Preserve Boomer Lake Park v. DOT*, 4 F.3d 1543, 1554 (10th Cir. 1993). Courts have characterized NEPA as creating democratic decisionmaking process that requires the agency to set its data and conclusions before the public "to ensure [] that the most intelligent, optimally beneficial decision will ultimately be made." *Center for Sierra Nev. Conservation*, 832 F. Supp. 2d at 1141-1142 (quoting *Oregon Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1099-1100 (9th Cir. 2010).

### *B. The PSICC failed to analyze adverse impacts of motorized recreation on the roads*

The analysis in the FEIS of the impacts of the roads does not in any way explain what the adverse "effects" of the roads were on natural resources, which is required under 36 C.F.R. § 212.55(a). Instead, the FEIS merely provides a yes or no response to questions such as "does the route intersect with impaired watersheds?" prepared by non-expert forest staff. *See, e.g.*, FS-00026115; FS-00003133 (emphasis added)

("While the core team members are not experts on each of the criteria, their substantial experience in the Ranger District allowed them to make an initial judgment on the route criteria"); FS-00003239 (same).[18] The analysis, however, provides no basis whatsoever to assume the road has an "effect" on the natural resource, much less what exactly or even approximately that effect is or its magnitude. The analysis equates to a windshield review.

For example, the road may be in an impaired watershed but miles from any body of water into which the watershed drains and any runoff from the road may never make it directly into a body of water but instead recede into the ground. Or the road may actually cross a body of water, but over hard rock so that the action of crossing has none or only minimal impacts on the body of water into which the watershed drains. The basic level of information needed for even a general assessment of impacts is missing from the cursory evaluation of the roads. The extremely cursory review set out in the FEIS precludes any meaningful balancing whatsoever between any presumed adverse effect and the recreational opportunities as well as the many other criteria set out in § 212.55(a), such as public safety, access needs, conflicts with other users and a need for maintenance. In fact, the PSICC's analysis was very much the same as the

[18]Although the FEIS also includes findings copied and pasted from the TAP Reports (FS-000026092)(NFSRs 220, 220.A, 220.B); FS-00026124 (NFSR 221); FS-00026120, 26125 (NFSR 540), these TAP Reports explicitly acknowledge that nothing in them constituted valid NEPA analysis. FS-00003236 ("Any actual route management decision made as a result of this [TAP Report] must be determined in a National Environmental Policy Act (NEPA) document"); AR 3130 (same). In addition, the FEIS cannot tier to the prior TAP Reports because those were non-NEPA documents. *Kern v. U.S. Bureau of Land Management*, 284 F.3d 1062, 1073 (9th Cir. 2002)(a site-specific project may not tier to a non-NEPA document); *Friends of the Bitterroot v. Marten*, 2020 WL 5804251 at *11 (D. Mont. 2020).

"check the box" approach which the court in *Idaho Conservation League* held to be a violation of the travel management rule. 766 F. Supp. 2d at 1073 (describing the FEIS "contain[ing] a large number of subject boxes with a variety of different checkmarks" indicating a yes or no response). As the court in *Idaho Conservation League* found, [t]here is no way to know how or if the Forest Service used this information to select routes under the required criteria. 766 F. Supp. 2d at 1073. For that reason, the court was not able to "assess whether there is a 'rational connection between the facts found and the decision made." *Id*. at 1074, citing *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv*., 378 F.3d 1059, 1065 (9th Cir. 2004).[19]

These same efforts also improperly resulted in the PSICC failing to propose all reasonable alternatives in the FEIS. While the PSICC was legally required under the 1984 Forest Plan to emphasize motorized recreation in Wildcat Canyon, no alternative was set out in the EIS allowing motorized recreation on all the roads at issue or on the popular Hackett-Longwater Loop or South Hackett loops (NFSRs 220 and 221). *See Center for Biological Diversity v. BLM,* 746 F. Supp. 2d 1055, 1087-88 (N.D. Cal. 2009)(finding agency violated NEPA when it failed to evaluate a reasonable range of alternatives given that all of the alternatives included the challenged action); FS-000445670 (setting out loops popular with motorized recreationists); FS-00030227 (setting out the South Park and South Platte District Ranger's agenda of blocking the popular loops used by motorized recreationists); FS-00000403 ("Management emphasis

[19]Prior to the PSICC's final decision, Petitioners provided the table at FS-00030203 to the PSICC which sets out the entirety of any and all references to these five Wildcat Canyon roads in the DEIS. *See* AR 30044 (discussing significance of the table). The entirety of these references were limited to the very cursory information set out on Table C-2 (also repeated on Table C-1). FS-00026115-16, 00026120, 00026124, 00026125.

[for areas designated as 2A which includes Wildcat Canyon] is for semiprimitive motorized recreation opportunities such as [] four-wheel driving both on and off roads and trails”); FS-00000743 (map showing Wildcat Canyon designated as subject to Management Area 2A guidelines); FS-00030218 (the South Park District Ranger ordered that all alternatives in the EIS be changed to propose that the Wildcat Canyon roads be decommissioned); FS-00030097.

### *C. The PSICC failed to analyze adverse impacts of decommissioning roads in Wildcat Canyon*

In the final decision at issue, the Forest Supervisor set out her determination to close and decommission the Wildcat Canyon roads at issue (NFSRs 220, 220.A, 220.B and 540). FS-00026886; FS-00026888-26889. The agency’s regulations, however, explicitly require it “to ensure that the identified [MRS] minimizes adverse environmental impacts associated with road [] decommissioning [.]” 36 C.F.R. § 212.5(b). Thus, even proposed actions to decommission roads must be subject to a rigorous NEPA process. *See Center for Sierra Nev. Conservation*, 832 F. Supp. 2d at 1144 (E.D. Cal. 2011) (“The requirement to identify roads for decommissioning is “[e]qually important” as the overall identification of the minimum road system [and b]oth decisions must be based on "a science-based roads analysis at the appropriate scale"), quoting 66 Fed Reg. 3206, 3207 (January 21, 2001); *see* FS-00002146 (the agency’s policy manual directs it to “[u]se appropriate environmental analysis to evaluate proposals to change existing travel management decisions” which decisions include a decision to decommission a route). In contravention and violation of this explicit legal requirement, the PSICC, however, conducted no analysis whatsoever of the adverse environmental impacts from decommissioning the roads at issue.

*D. The PSICC failed to analyze adverse impacts of increasing motorized recreation on other areas*

The PSICC was also required to but failed to assess the indirect and cumulative impacts of the decision to close the roads at issue. 40 C.F.R. §§ 1502.14, 1508.1(g) (defining effects to include direct, indirect and cumulative effects); *Idaho ex rel. Kempthorne v. U.S. Forest Service*, 142 F. Supp. 2d 1248, 1263 (D. Id. 2001)("The duty to discuss cumulative impacts in an [EIS] is mandatory"); *see* FS-00030052-0053. The recognition of the existence of these indirect and cumulative impacts had been made in the 2004 EA and the final decisions related to it where the PSICC had concluded that, due to the popularity of the roads at issue, prohibiting motorized recreation on the roads would increase the impacts of motorized recreation on other areas in the PSICC and possibly create overcrowding leading to "low visitor satisfaction." FS-00030164; FS-00019666-19667; FS-00019686-19687; FS-00024572; FS-00026238 (comment 10-1 stating PSICC would be increasing congestion on the roads left open). The PSICC, however, failed during the process at issue to validly assess the impacts of concentrating motorized recreation on other roads resulting from closing these popular roads to that type of recreation. Given the 2004 EA findings confirming this impact of diverting use elsewhere as significant, the PSICC cannot summarily dismiss the impacts of concentrating this recreational activity on other areas as minimal without actually assessing it. *See Idaho Conservation League*, 766 F. Supp. 2d at 1066-67 (the agency provided no rational basis for its conclusion that recreation on roads less than a half-mile long would only have minimal impacts).[20] By doing so, the agency violated NEPA.

[20] The instant matter also involves the indirect impact where closing roads to motorized recreation will shift that recreation to other areas and lead to overcrowding, which was

NEPA requires an agency to first assess the environmental impacts of its decisions to "ensure[] that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989); *Idaho Conservation League*, 766 F. Supp. 2d at 1064. By not conducting the required NEPA analyses, the PSICC precluded any reasonable and informed public comment based on the evaluated impacts. When an agency fails to conduct required NEPA analysis, the public is unable to provide meaningful comments. The failure to conduct this analysis therefore resulted in both a lack of meaningful public comment and an uninformed and thus arbitrary proposed decision by the Forest Supervisor.

**5. The PSICC repeated many of the same legal violations it made with respect to the Wildcat Canyon roads when prohibiting public motorized recreation from roads in the Loveland Mountain area.**

The Forest Supervisor's final decision to close NFSRs 192, 450 and 451 in the Loveland Mountain area to public motorized recreation was also based on plainly erroneous TAP Report findings that the roads had low recreation benefit. In addition, the final decision was based on a patent error on the maps the PSICC relied upon which incorrectly showed the location of NFSR 450 and resulted in it being given an incorrect assessment as to its adverse environmental impacts. But for these errors, NFSRs 192, 450 and 451 would have been recommended to remain on the MRS and, as a result, kept open to public for motorized recreation.

---

not an issue in *Idaho Conservation League*, 766 F. Supp. 2d at 1065-66, a case that solely focused on the fact that there was no increase in roads under the MVUM at issue.

The record clearly demonstrates that NFSRs 192, 450 and 451 are very popular roads for motorized recreationists but were nonetheless erroneously found to have a low recreational use benefit in the TAP Report. *See supra* pp. 33-35. Based on their popularity and the access they provided, the roads should have been found to have a high recreational use benefit. Petitioners raised these issues as to the invalid recreational use benefit findings in their comments. FS-00045994-46003. The PSICC response was to again assert that the findings were from the TAP Reports and would not be adjusted. FS-00026157; FS-00026160 (the decision reflects the "travel analysis reports"). In other words, the PSICC was treating the non-decisional TAP Report findings as final and unchallengeable even in light of factual evidence clearly showing the findings were erroneous.

As with the roads in Wildcat Canyon, had the TAP Report properly found that these roads had a high recreational benefit, the TAP Report would have recommended these roads be included in the MRS and that recommendation would have been incorporated into the FEIS and final decision. FS-00003721; FS-00003730; FS-00025717; FS-00025718.

The TAP Report also set out a finding that motorized recreation on NFSR 450 had a high risk of adverse environmental impacts. FS-00003272. The PSICC, however, based this finding on erroneous maps which showed the road being nowhere near its actual location. Petitioners pointed out this error as to the location of NFSR 450 in their comments as well as in their objections. FS-00045998; FS-00026932; FS-00026952-00026953.

The PSICC responded to Petitioners' comment by again stating it was relying on the TAP Report findings. FS-00026165 ("The specific management of converting to a special use permit only road is provided in the TAP/TAR report and adopted across all action alternatives"). In the Acting Regional Forester's response Petitioners objections, she admitted this mapping error had occurred but claimed, without any specific support except a citation to the FEIS at pages 2-3 and Appendix D-20, that the mapping errors had been "offset" through a "district-level analysis." FS-00031215.

The cited statements in the FEIS, however, in no way show that the PSICC recognized the specific mapping error at issue and instead indicate they were ignored based on the PSICC refusing to revise the TAP Report findings. FS-00025712 (stating that in developing the alternatives, "PSI staff and specialists further revised the MRS outcomes by applying site-specific district level knowledge to [] correct errors in mapping"); FS-00026157 ("Revision of the TAP /TAR Reports is beyond the scope of this undertaking"). Other than this extremely broad and vague statement at FS-00025712, there are no documents anywhere in the record which document any correction of the admitted mapping error as to NFSR 450. Therefore, rather than demonstrating the PSICC recognized the mapping error and conducted a revised assessment of the risks related to NFSR 450 due to the error, the record instead demonstrates that the PSICC evaluated risks on a road which does not exist which obviously resulted in arbitrary findings.

**6. The PSICC repeated many of the same legal violations it made with respect to the Wildcat Canyon roads when prohibiting public motorized recreation from roads in the Winding Stairs area.**

The Forest Supervisor's final decision to close NFSRs 323 and 324.B in the Winding Stairs area to public motorized recreation was also based on plainly erroneous TAP Report findings that the roads had low recreation benefit. NFSRs 323 and 324.B were also given patently false recreational use benefit ratings of only moderate and low (respectively) in the TAP Reports even though the roads are popular with motorized recreationists and provide important access to other areas. Notably, the final decision to decommission NFSR 323 rather than keep it as part of the MRS was directly contrary to the MRS guidelines *even with* its false recreational use benefit rating. Therefore, the Forest Supervisor's decision to decommission NFSR 323 was arbitrary. The PSICCC's decision to decommission NFSR 324.B was also arbitrary because, as demonstrated below, that road clearly should have been assigned a high recreational use benefit rating which would have resulted in the road being kept as part of the MRS.

NFSR 323 is popular with motorized recreationists and also provides key access to recreational areas. *See supra* pp. 35-36. Nonetheless, NFSR 323 received a moderate recreational use benefit rating along with a low risk rating. FS-00003738. Even with a moderate rating for its recreational use benefit, NFSR 323 should have been proposed for conversion to a trail open to all vehicles under the MRS guidelines. FS-00025718 (if a road has a moderate or high recreational use benefit and low risk, "[m]anagement recommendation is *Convert to trail open to all vehicles*"); *see* FS-00026189 (comment 2237-3 stating that NFSR 323 "should stay open because [it]

scored moderate to high on the TPA assessment"). Instead, the PSICC inexplicably decided to decommission the road without any valid explanation. FS-00026882.

The PSICC again provided its standard non-response to CORE's comments in the FEIS regarding the error by stating that it was not going to revisit or change and TAP Report findings. FS-00026179 (response to comment 183-B); FS-00026430 (response to comment 2917-23)(same); FS-00026210 (response to comment 2917-22)(same). This decision to decommission NFSR 323 was therefore arbitrary and capricious.

NFSR 324.B is also a very popular road and provides key access. *See supra* p. 37. Based on these facts in the record, NFSR 324.B should have received at least a moderate recreational use benefit rating rather than a low rating. FS-00003738. Had a valid moderate rating been given to NFSR 324.B, the road would have been converted to a trail open to all vehicles under the travel management guidelines. FS-00025718. The PSICC again provided its standard non-response to CORE's comments in the FEIS regarding the error by stating that it was not going to revisit or change and TAP Report findings. FS-00026179 (response to comment 183-9). In her responses Petitioners' objections as to these roads, the Acting Regional Forester actually agreed that a proper application of the MRS rubric should have resulted in NFSR 323 being converted to a trail open to all vehicles while NFSR 324.B should have been converted to a special use permit road. FS-00031170; FS-00027073-27084. She then directed the Forest Supervisor to provide a valid rationale for departing from the MRS rubric. *Id.*

In response, the Forest Supervisor again relied on the TAP Report findings and also provided an alleged rationale which was not set out anywhere in or supported by

the record which showed that the road was in fact highly popular and provided key access. FS-00026771 (Issue No. 1, Forest Rationale)(referring to "remote and dead-end (in and out) nature of these segments"). Furthermore, the failure to disclose these new assertions to the public precluded any opportunity to comment on them. Therefore, because the final decision to decommission the roads relied on invalid bases only disclosed after the decision was made and never disclosed them for public comment, it is unlawful, arbitrary and not supported by the record.

**7. The PSICC repeated many of the same legal violations it made with respect to the Wildcat Canyon roads when prohibiting public motorized recreation from roads in the Peerless Mountain area.**

As with the Wildcat Canyon roads, the PSICC erroneously found that NFSR 603 (Peerless Mountain Road), which is a very popular road for motorized recreation that also provides key access, had a "moderate" recreational use benefit. But for this clear false finding, public motorized recreation would likely continued to have been authorized on NFSR 603 rather than it being closed to the public. In addition, NFSR 603 was somehow found to have a high risk of adverse environmental impacts even though the record in no way supports such a finding. Because of these clear errors, no alternative proposed leaving NFSR 603 open to public motorized recreation.

Pursuant to the TAP Reports, "[a] High (H) [Recreational Use Benefit] rating was assigned to roads that are the primary access routes to developed recreation sites/facilities, or *primary access routes to popular dispersed recreation areas*, *or the road has high value as a recreation experience*." FS-00003251. As discussed above, NFSR 603 is an extremely popular route used by 4WD recreationists to access historic mine ruins at the Peerless Mountain site, provide hiking access to nearby lakes and the

summits of two mountains as well as view high alpine scenery around Peerless Mountain. *See supra pp. 37-38.* Notwithstanding that these facts, the TAP Report inexplicably made a finding that NFSR 603 only had "moderate" recreational use benefit and the PSICC closed it to public use. FS-00003273; FS-00028875.

A 'high' recreational use benefit score (numerical score 2) would have given NFSR 603 a high overall benefit score when combined with its score of 2 for special uses, putting it in the H/H category. FS-00003273; FS-00003256 ("roads with a Total Benefit factor greater than 3 represent high benefit roads"). In response to the many, many comments received by the PSICC clearly showing the high recreational use benefit of NFSR 603, the PSICC provided a boilerplate non-response again reaffirming that the PSICC was refusing to change the prior TAP Report findings:

> Recommendations for route management are based on a combination of TAP/TAR reports and rating, data from scoping, MRS screening criteria, and site-specific information. Revision of the TAP/TAR reports is beyond the scope of this undertaking.

FS-00026196 (responding to a comment stating "Peerless Mountain is a spectacular drive with scenic and historic value" and "[t]he TAP score was only rated as Moderate which I think should have been High").

Under the MRS rubric described in the FEIS, roads with high ratings for both benefits and risks were recommended to be kept open to public use with mitigation measures. FS-00003259. Had NFSR 603 correctly received a 'high' recreational use benefit rating, it would have received a high overall benefit rating and, pursuant to the MRS rubric, it would have been recommended that it be converted it to a trail open to all vehicles, keeping it open to the public. Because of its 'low' overall benefit score,

however, every action alternative considered in the travel management process proposed to either decommission NFSR 603 or convert it to a special use permit road.

In addition, the TAP Report finding that NFSR 603 had a high risk of adverse environmental impacts was blatantly false. FS-00003273. The only basis provided for the finding was the single assertion that "NFSR 603 is located near a drainage and runoff from the road could affect that drainage." FS-00026183. As shown by the photo below, NFSR goes nowhere near any drainages.




FS-00027045. Furthermore, this risk finding is not supported by the statement in the FEIS that NFSR 603 does not intersect impaired watersheds, wetlands or riparian areas or areas with erosive soils. FS-00026120. Thus, this blatantly incorrect high risk finding is not supported by the record and arbitrary.

**8. While the PSICC properly recognized the very high recreational use benefit from motorized recreation on all of NFSR 126 (Twin Cones Road), it came up with a contrived and invalid bases to nonetheless improperly prohibit that recreation on the full road.**

The PSICC improperly decided to permanently close the upper section of NFSR 126 (Twin Cones Road) to motorized recreation notwithstanding its admittedly high recreational use benefit. The PSICC also improperly refused to include any alternatives in the travel management process which reopened this section of NFSR 126 to motorized use even though, had the guidelines in the TAP Report been followed, the agency would have recommended that this section of the road be part of the MRS and would have amended the Forest Plan, as it had originally proposed and also had done for other popular roads, to permit that recreation. The reasons the Forest Supervisor provided in response to Petitioners' comments pointing out these errors were either erroneous or entirely without support in the record.

As demonstrated *supra* at page 40, even the PSICC agrees that all of NFSR 126 provides a high recreational use benefit. As the TAP Report stated, a road with a high recreational use benefit were needed as part of the MRS. FS-00003155. The TAP Report, however, did not recommend keeping the upper portion of NFSR as part of the MRS *solely* because that portion was located in an area erroneously designated by the current Forest Plan for 3A management. FS-00003161 ("Recommend eliminating public access w/I 3A ; from MP 5.13 to 7.37; keep as admin road"). Because the PSICC had proposed to change the Forest Plan to correct the prior mapping error and remove this portion of NFSR 126 from this management area (FS-00045774), the PSICC should have included in Alternative C (or at least one of the alternatives) a proposal to open this upper portion of 126 to motorized recreation, but it did not.

The PSICC provided invalid responses to the Petitioners when they pointed out these errors. The PSICC stated that it was relying on the TAP Report recommendation to close this portion of NFSR 126 even though, as shown above, that recommendation was based on the area being erroneously in a 3A management area. FS-00026155-26156; FS-00026185; FS-00026232. And the Acting Regional Forester's assertion that the recommendation to omit NFRS 126 from the MRS was valid because the TAP Report found a possible high risk of adverse environmental impacts was directly contradicted by the actual FEIS which determined that, contrary to the TAP Report proposed findings, motorized recreation on NFSR 126 would have "minor" environmental impacts. FS-00025989-FS-00025990. The Acting Regional Forester also alleged, without any support whatsoever in the record, that the recommendation was validly based on concerns of potential vandalism. FS-00031239; FS-00003127-3176. This assertion, therefore, is false.

The Forest Supervisor also arbitrarily reversed her position in the final ROD when she claimed that she had decided that allowing motorized recreation on the upper section of NFRS 126 was not "necessary to allow reasonable public access" on that road. FS-00026715. The Forest Supervisor had, however, previously determined in her Draft ROD that motorized recreation on this part of NFSR 126 would "provide reasonable recreation opportunities, while providing for multiple use management, such as resource protection." FS-00026591. The Forest Supervisor, however, never identified why she had suddenly decided that motorized recreation on this part of NFSR 126 was not necessary given that she had previously decided it was needed to provide these recreational opportunities.

Furthermore, the PSICC also violated NEPA because it should have included in at least one alternative a proposal to open the upper portion of NFSR 126 to motorized recreational use given that the TAP Report guidelines stated that the upper portion of 126 should have been part of the MRS. The PSICC's decision to omit any such alternative was apparently driven by it having agreed, in order to settle the prior litigation, to close NFSR 126 even before any NEPA analysis or balancing under the MRS regulations had been completed.

**9. The PSICC failed to respond to CORE's comments submitted in response to the DEIS.**

The PSICC also failed to address the specific comments made by Petitioners in response to the DEIS. FS-00024426; FS-00024569. While the agency identified the individuals whose comments it was responding to in the FEIS at Appendix D, it never responded to any comments made on behalf of Petitioner Colorado Off Road Enterprise and submitted by its counsel, Kevin Garden. Those comments were submitted to the agency on November 4, 2019. FS-00024426. This omission by itself constitutes a violation of NEPA. *Idaho Conservation League*, 766 F. Supp. 2d at 1075 ("t]he fundamental problem here is that the Forest Service did not address Plaintiff's comments[, t]herefore the decision lacks the rational basis required"). For this additional reason, the PSICC's final decision is invalid as a matter of law.

## III. CONCLUSION

For the reasons set forth above, Petitioners respectfully request that the Court grant the Petition for Review and issue an Order finding that:

A. Respondents violated Travel Management Regulations 36 C.F.R. § 212.5(b) by failing to properly establish a minimum road system (MRS) pursuant to that regulation;

B. Respondents violated Travel Management Regulations 36 C.F.R. § 212.52(a) by failing to properly allow public participation when designating uses on National Forest System roads;

C. Respondents violated Travel Management Regulations 36 C.F.R. § 212.54 by failing to act in accordance with the appropriate regulations when designating uses on National Forest System roads;

E. Respondents violated Travel Management Regulations 36 C.F.R. § 212.55(a) by failing to properly consider the effects on natural resources and recreational opportunities when designating National Forest System lands for use by motorized recreation;

F. Respondents violated NEPA and its implementing regulations by failing to properly assess the likely adverse environmental impacts and recreational use benefit of allowing and not allowing motorized recreation on the roads at issue;

G. Respondents violated NEPA and its implementing regulations by failing to include a reasonable range of alternatives in its FEIS;

H. Respondents violated NEPA and its implementing regulations by failing to respond to all of Petitioner's comments submitted in response to the DEIS;

I. Respondents violated NFMA by violating the management prescription for the Wildcat Canyon area and all but eliminating motorized recreation in that area;

J. Respondents violated NFMA and MUSYA by failing to properly balance the public's need for motorized recreation on the roads at issue;

K. Respondents are enjoined from implementing or relying upon the FEIS and Final ROD to the extent those documents preclude public motorized recreation on the roads at issue;

M. Respondents are enjoined from taking any actions on the ground which implement the FEIS and Final ROD to the extent those actions preclude public motorized recreation on the roads at issue;

N. Petitioners are entitled to their costs, expenses, and reasonable attorneys' fees associated with this litigation as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d) and any other statute.

Respectfully submitted this 22th day of January, 2024.

By:

s/ Kevin R. Garden
Kevin R. Garden
THE GARDEN LAW FIRM, P.C.
66 Canal Center Plaza, Suite 505
Alexandria, VA 22314
*Telephone*: (703) 535-5565
*Email:* kevin@gardenlawfirm.com

s/John T. Melcon
John H. Melcon
SHERMAN & HOWARD L.L.C.
90 S. Cascade, Suite 1500
Colorado Springs, CO 80903
*Telephone*: (719) 448-4007
*Fax:* (719) 635-4576
*Email:* jmelcon@shermanhoward.com

Attorneys for Petitioners